POKEGAMA SUGAR PINE LUMBER CO. v. KLAMATH RIVER LUMBER
& IMPROVEMENT CO.

(Circuit Court, N. D. California.   August 7, 1899.)

No. 12,578.

1. ESTOPPEL—WAIVER OF BREACH OF CONTRACT.
   Defendant leased to complainant for a term of seven years a large lum-
ber plant, which required for its successful operation a larger investment
of capital than defendant could command.   Defendant was to receive a
share of the product, and the lease provided that the mill should be oper-
ated to its full capacity.   During the first season it was not operated to its
full capacity, nor to the extent it could have been, which fact was known at
all times by the officers and principal stockholders of defendant, who, while
making some complaint, made no claim to a forfeiture of the lease, but,
on the contrary, after being informed in September that it was not the
intention of complainant to further operate the mill until the following
spring, continued to advise with complainant in regard to improvements
and expenditures in preparation for future work.   In February following,
when complainant was ready to start the mill, and after it had expended
in improvements and in procuring logs for the season's work upward of
$70,000, defendant, without notice, took possession of the mill, and forcibly
held it against complainant, claiming a forfeiture of the lease on the
ground of a failure to fully operate the mill.   Held, that by its conduct de-
fendant had waived any breach of the contract in that regard, and was es-
topped to claim a forfeiture therefor.

2. EQUITY JURISDICTION—INJUNCTION—ADEQUATE REMEDY AT LAW.
   In such case complainant was without a plain, adequate, and complete
remedy at law which would exclude the jurisdiction of a federal court of
equity to grant an injunction against the ·continuance of the unlawful
acts of the defendant, it being shown that complainant had purchased a
large tract of timber land on the faith of the lease, and had cut several
million feet of logs, which would rapidly deteriorate in value if not sawed.

3. SAME—STATUTORY REMEDY AT LAW.
   A remedy at law, to oust a federal court of equitable jurisdiction, must
·be one which existed at common law when the judiciary act of 1789 was
passed, or which has been provided by congress; and a statutory action
of forcible entry and detainer not maintainable in a federal court is not
such a remedy.

4. SAME—ACTION OF EJECTMENT
   Where a lessee has been forcibly dispossessed by the lessor because of a
failure to comply with the terms of the lease, which worked a technical
forfeiture of the lease, but which the lessor is equitably estopped to insist
upon, an action of ejectment does not afford the lessee an adequate remedy
which will prevent him from maintaining a suit in equity in a federal court,
as the equitable rights of the parties cannot be considered by such court in
an action of ejectment.

This was a suit in equity to enjoin the defendant from forcibly
interfering with complainant's possession of a lumber plant and saw-
mill under a lease.   On final hearing.

E. S. Pillsbury (F. D. Madison and James F. Farraher, of counsel),
for complainant.

F. S. Stratton (S. C. Denson, W. W. Kaufman, H. B. Gillis, and
James R. Tapscott, of counsel), for respondent.

MORROW, Circuit Judge.   This is an action to restrain the re-
spondent from interfering with the complainant in the occupation,

conduct, and management of its lumbering business at Klamathon, in Siskiyou county, Cal. It is alleged in the bill that complainant is a corporation organized under and by virtue of the laws of the state of California, and that respondent is a corporation organized and existing under the laws of the state of Oregon; that on February 24, 1897, respondent and one Hervey Lindley entered into a written agreement by which respondent agreed to lease to Hervey Lindley or his assigns its entire lumber plant in Siskiyou county, Cal., and Klamath county, Or., for the term of two years from and after March 30, 1897, the consideration for the lease being an annual rent of one dollar per year and a division of the profits, by which respondent corporation was to receive one-third and said Hervey Lindley two-thirds of the total profits. It was further agreed that the said Lindley or his assigns should have the privilege of continuing the lease under the same terms and conditions to March 30, 1902, which privilege was afterwards extended by an additional agreement to March 30, 1904, and the division of the profits changed for this additional period to 45 per cent. for respondent and 55 per cent. for Lindley and his assigns. It is alleged that on April 7, 1897, respondent corporation made, executed, and delivered to Lindley a lease of all the property described in the agreement of February 24, 1897, and in accordance with its terms; that upon the execution of this lease Lindley signed and accepted the same, and entered into possession of the property mentioned therein, and undertook the management and operation of it as a lumbering business; that on the 15th day of September, 1897, Lindley sold, assigned, and transferred to the Pokegama Sugar Pine Lumber Company, the complainant herein, the said instrument in writing, and all his right, title, and interest therein, and thereupon the complainant entered into the possession of said property under and pursuant to the terms of said instrument in writing, and thereafter conducted, operated, and carried on the plant and lumbering business in accordance with the terms of the lease, and kept and performed all the covenants and requirements provided in the lease until the occurrence of the interferences, unlawful acts, and interruptions described in the bill; that the lumbering plant consists of a sawmill and log jack, with booms, lumber yard, tramways from the planing mill to the yard, planing mill, etc., on the bank of the Klamath river, at Klamathon, on the line of the California & Oregon Railroad, in the county of Siskiyou; a log slide about 24 miles above the sawmill; that the logs are conveyed to this log slide by a railroad about 9 miles in length, about 2 miles of which was actually built by complainant, and complainant holds the legal title to all of the railroad, together with the rolling stock, including the engine; that the logs hauled over the railroad are cut from lands occupied by complainant, and that respondent has no right, title, or interest in the lands whereon the logs were cut; that between the 7th day of April, 1897, and the ———— day of February, 1898, the said Lindley and complainant cut and caused to be cut 15,000,000 feet of logs, to be sawn at the sawmill during the sawing season of the year 1898; that of this about 4,500,000 feet were in the woods adjacent and contiguous to

the railroad, about 6,000,000 feet ready to be loaded upon the cars, about 4,500,000 feet in the river, accessible to the sawmill at Klamathon, and about 1,000,000 feet in the booms connected with the mill; that in cutting and preparing the said logs for the mill complainant had expended more than $50,000, and had expended more than $20,000 in equipping the mill, railroad, and other portions of the plant in readiness for operating the said plant during the sawing season of 1898, which began about the ———— day of February, 1898, and for which complainant had the whole plant in readiness; that on the ———— day of February, 1898, in the nighttime, respondent, acting by and through its president, J. R. Cook, and by W. E. Cook and John S. Cook, as directors and agents of said corporation, violently and by force of arms entered the sawmill, drove the watchman of complainant out of the sawmill, excluded the complainant therefrom by force and violence, and then proceeded to block up the said mill so as to prevent the use thereof, or the taking of logs from the booms or lumber from the yard, by barricading the openings of the mill; that in so forcibly taking and occupying said sawmill respondent employed not only its president, J. R. Cook, and its directors and agents, W. E. Cook and John S. Cook, but also from four to six fighting men, who entered the mill in the nighttime, armed with shotguns and rifles, drove out complainant's watchman by threats and violence, and have ever since remained in the mill, armed with shotguns, rifles, and ammunition, and by threats and force and the exhibition of firearms have excluded and still exclude complainant, its agents, representatives, and employés from the mill, and prevented the use and occupation thereof by complainant; that the cause and purpose of the forcible and violent entry by respondent was to compel complainant to abandon the said premises, and because respondent has entered into a contract for the sale of the said property, provided that it can deliver possession to the proposed purchasers, and that respondent has threatened to annoy and harass complainant so as to prevent its operating the plant; that the acts of respondent were not preceded by any peaceable entry upon the said property, or any part thereof, or any attempt to make such entry, or any demand upon complainant for the possession of the same, or the privilege of entering thereon, or any complaint that Lindley or complainant had failed to keep or perform any of the covenants or conditions of the lease dated April 7, 1897; that, on the contrary, on the ———— day of December, 1897, at the request of respondent, complainant furnished to it a written statement showing the result of the operations of Lindley and the complainant to that date; that respondent has never since interposed any objections, but that since that date complainant has continued to cut logs, to make repairs, and to conduct the lumbering business at an outlay of more than $10,000, all of which will be lost to complainant, as well as amounts heretofore expended, and profits which would arise, unless complainant can continue to operate the plant; that, on account of the violent and unlawful acts of respondent, complainant has suffered great and irreparable injury by delay and interference in the prosecution of its lumbering business, and, unless respondent be enjoined and

restrained from a continuance of its unlawful acts, complainant will suffer still greater and further irreparable injury and damage, and more particularly in this: that the season for floating logs down Klamath river will expire about June 1, 1898; that, the water in the river being unusually low this season, a shorter season than usual is to be anticipated; that, if the logs cut are not floated this season, they will suffer a deterioration of 50 per cent. in value, and will become a total loss if not used in 1899; that complainant has sufficient logs to run said sawmill at its fullest capacity during the remainder of the year, if not interfered with; that the said sawmill is the only one available to complainant, and the only mill to which the logs can be delivered; that there is no sale and no use for the logs except to be worked at the said mill; that by a failure to work said logs during the season of 1898 complainant will lose large profits which it would otherwise obtain therefrom, and which are not capable of accurate computation, and that by the wrongful acts of respondent complainant has been and is subjected to a daily expense of $100 or more, which is a dead loss to complainant; that respondent threatens to continue its interruptions and annoyances aforesaid, and will continue them unless enjoined and restrained by this court; that respondent is insolvent, and unable to respond in damages to complainant on account of the unlawful acts and injuries mentioned, and that complainant has no plain, adequate, and complete remedy at law.

On April 2, 1898, complainant filed an amended complaint, in which it alleges, in addition to the foregoing, that any judgment which might be recovered against respondent in an action at law would be wholly worthless, and could not be satisfied in whole or in part; that practically all the property of respondent situated within the state of California is in the county of Siskiyou, the full cash value of which, as stated by respondent to the assessor of that county, and as assessed by him, is the sum of $23,000; that this comprises the whole of the property of respondent, except a tract of timber land in the state of Oregon, of the value of not more than $10,000, which tract of land is mortgaged, and a small tract of land in Minnesota, mortgaged at more than its value; that respondent, for the purpose of placing all of its property beyond the reach of any execution which might be levied against it, mortgaged, on or about the ———— day of February, 1898, all the property belonging to it under the said lease, to the amount of $92,000, at the rate of 6 per cent. per annum; that the value of respondent's property does not equal the value of the mortgage liens and other incumbrances with which it is charged, and said property could not be sold for an amount to satisfy the liens existing upon it; that said property and plant were managed by respondent at a great loss of money, in consequence of which management respondent and its officers became indebted to the amount of more than $36,000, of which the sum of more than $12,000 is due to men employed by respondent, who are unable to collect their claims; that respondent did not pay its business obligations, and in consequence thereof many creditors were obliged to bring actions at law, and to attach portions of said lum-

bering plant and property; that in many of such actions judgments were obtained, and portions of said property sold under executions issued upon said judgments; that on or about the ——— day of May, 1897, a judgment for the sum of $800, or thereabouts, was obtained against respondent in the superior court, county of Siskiyou, in this state, upon a contract debt; that a writ of execution was issued and placed in the hands of the sheriff for the purpose of satisfying said judgment; and the sheriff under this writ sold the mill mentioned in the said lease, and the land upon which it stands, for $900, and that said property has never been redeemed from such sale; that respondent has during the term of three years allowed its taxes to become delinquent, and sales to be had of said property to the state for unpaid taxes; that at the time of the execution of said lease more than 85 per cent. of the capital stock of respondent was owned by J. R. Cook, W. E. Cook, and John S. Cook, and that all and each of them are insolvent, and unable to pay their debts as they fall due, and are not possessed of any property which could be levied upon to satisfy any judgment which might be recovered against them, and any judgment which complainant might recover for the wrongful interferences, interruptions, and annoyances aforesaid would be wholly worthless.

Upon the filing of the bill, on March 17, 1898, an order was issued requiring respondent to show cause why an injunction pendente lite should not be granted, and, upon complainant giving a bond in the sum of $10,000, a stay order was issued restraining the respondent from in any manner interfering with, impeding, or hindering complainant in occupying, conducting, managing, and carrying on all the property mentioned in the lease. On April 12, 1898, the respondent moved the court for a modification of the restraining order so that the respondent be not required to surrender the possession of the mill, office, and barn mentioned in the bill of complaint; that the complainant be ordered and directed to restore all of the property mentioned in the bill to the same condition, as regards possession thereof, as the same was in at the time of the filing of the bill, in so far as such possession may have been changed or affected by any order of the court. This motion was denied. Pokegama Sugar Pine Lumber Co. v. Klamath River Lumber & Improvement Co., 86 Fed. 528.

Respondent filed its answer on May 16, 1898, in which it admits the written agreement made with Hervey Lindley May 4, 1897, as stated in the complaint, and that the agreement was modified, as stated in the bill. Admits that a lease was made, executed, and delivered to respondent as set forth in the bill; admits that, on the execution of this lease by respondent, Lindley signed and accepted the same, and entered into the property described in the lease, and undertook the management of the logging (lumber) business. Denies that between April 7, 1897, and September 15, 1897, or at any time, Lindley operated and carried on the property pursuant to the terms of the lease, and kept or performed all or any of the conditions provided in the lease to be kept and performed by him, and avers that the lease provided that "the party of the second part hereby binds himself, his executors, administrators, or assigns, to take

possession of said lumbering plant, property rights, and franchises immediately upon the execution of this lease, to operate said plant as a lumbering business to its fullest capacity in keeping with the best business interests of said parties thereto, and to its profitable operation"; that the capacity of said lumbering plant now is, and on April 7, 1897, was, over 50,000 feet of merchantable lumber per day of 10 hours, or at least 13,000,000 feet of merchantable lumber for 10 months of 26 working days per month of 10 hours per day; and that it is practicable to operate the lumbering plant at all times of the year. Avers that, if Lindley had so desired, he could have had sufficient sawlogs at the boom to have commenced sawing on May 15, 1897, and could have kept the mill in operation, and could have cut therein 50,000 feet of merchantable lumber per day of 10 hours, or, by running two shifts, could have cut 100,000 feet of lumber per day, and could have kept the mill in constant operation since that day. Avers that from April 7, 1897, to September 15, 1897, while Lindley had the management of the sawmill and plant, the sawmill was operated in all 22 days, during 19 of which Lindley sawed 1,100,000 feet of lumber on his own account, and on the remaining 3 days Lindley sawed 150,000 feet of lumber from logs furnished by J. R. Cook, so that the entire product of the sawmill between April 7, 1897, and September 15, 1897, was 1,250,000 feet of lumber, whereas a reasonable product, allowing from April 7, 1897, to May 15, 1897, for making preparations, should have been 10,-400,000 feet of lumber. Denies that complainant, subsequent to September 15, 1897, operated said plant in pursuance of the terms of the lease to Lindley, but avers that the mill has never been operated by complainant, and that no lumber was sawn therein after September 15, 1897, and prior to February 12, 1898. Avers that at or immediately after the execution of said lease Lindley conceived the idea of defrauding respondent out of the said property by so mismanaging the lumbering business as to produce no profits, and so distress respondent, which was at that time embarrassed for want of sufficient funds with which to carry on its business, and, as was well known to Lindley, had leased the plant to him upon that account, principally upon his assurances that he would operate the plant to its fullest capacity, and so as to secure respondent an income from the business; and that, if respondent had not relied upon such promises, it would never have consented to the said lease; that it was fully understood between Lindley and respondent that the sawmill plant was of great value, and had cost not less than $400,000, and that the sawmill had the capacity to cut 5,000 feet of good merchantable lumber per hour, and could, by running 10 out of each 24 hours, cut and manufacture at least 50,000 feet of such lumber; and that with reasonable management and energy the said sawmill could in each year cut and manufacture 26,000,000 to 30,-000,000 feet of such lumber. Avers that all the conditions were favorable to the carrying on of the business throughout the entire year; that the logs could be floated down the Klamath river from the timber lands, and a constant supply kept at the boom at any time, and that the mill could be operated at least 300 days a year; that

upon each 1,000 feet of lumber manufactured intelligently and economically in the said mill there is a net profit of from $3 to $29, and an average profit of not less than $6, and the annual-net profits of the mill under reasonably good management are and should not be less than $150,000; that all these facts were well understood and known by both parties at the time the lease was made; that, if Lindley had performed his part of the contract, respondent would have had an income from the plant of not less than $50,000; that Lindley neglected to repair the logging railroad so as to keep it in order; that at or immediately after the execution of the lease George Mason, Dean Mason, and John E. Coffin combined with Lindley in his schemes to defraud respondent; that in the month of September, 1897, he and they formed the complainant corporation, to which the lease was assigned, and ever since that time they have carried on the same scheme for the injury of respondent. Denies that respondent, acting through its president, J. R. Cook, and W. E. Cook, and John S. Cook, or either or any of them, forcibly entered the mill and committed the acts complained of in the bill. Avers in this behalf that complainant had, by its neglect, damaged respondent in the sum of not less than $41,000, and that respondent's attorney had advised it that it had the legal right to reoccupy the sawmill and plant, and to hold and use it; that on or about February 12, 1898, respondent sent its employé John S. Cook and three other employés, at about 8 o'clock in the evening, to take possession of the said sawmill, and these employés did take possession of it, quietly and without force, on behalf of the respondent, and, in order to retain such possession, proceeded to and did inclose the said sawmill with lumber; that it is not true that respondent, in so occupying the sawmill, employed from four to six fighting men, nor any fighting men whatever, nor that these fighting men drove away complainant's watchman with threats and violence. Avers that when John S. Cook and others entered the sawmill complainant's watchman departed without the use of any force, violence, or threats, and respondent entered into and maintained quiet possession thereafter. Admits that respondent's agents and employés did bring guns into the sawmill, so as to make a show of force, owing to an anticipation of violence on the part of complainant's agents. Admits that it claims the right to the possession of the said sawmill and all other property embraced within the lease of April 7, 1897. Avers that, if Lindley and complainant had exercised reasonable business care and energy, a sufficient quantity of logs could have been cut, hauled, and deposited in said river, and floated down to said sawmill, during the year 1897 and January, 1898, to have kept said sawmill constantly in operation during the whole of the year 1898, but that in this respect complainant and Lindley have been careless and indifferent, and have neglected to perform their duties under the lease. Avers that respondent is solvent, and amply able to pay any judgment which complainant might obtain in an action at law against respondent. Avers that respondent in good faith executed a mortgage to B. A. Watkins for $92,000, with interest at 6 per cent. per annum, upon the premises named in said lease and other property,

which property was worth more than double the amount of incumbrance, and the execution of the mortgage was rendered necessary by the unlawful and dishonest acts of the said Lindley and complainant. Denies that the property belonging to respondent does not equal the amount of mortgage liens and incumbrances with which it is at present charged, but avers that the property can be sold for more than $100,000,—more than enough to pay the said mortgage and existing indebtedness of respondent. Denies that it is now, or has at any time been, insolvent. Denies that respondent has not paid its demands, debts, and obligations as they have arisen, and that creditors of respondent have been obliged to bring suit against it, and to attach portions of the lumbering plant and property, and that portions of said property were sold under execution for the purpose of satisfying the demands of creditors, except that in one case suit was brought, and the demand has been fully paid and settled. Denies that a judgment for the sum of $800 was obtained against respondent in the superior court of the county of Siskiyou, or in any other court, upon a contract debt or any other debt, that a writ of execution was issued thereon, that the sheriff of the said county, pursuant to this writ, sold the said mill and the land upon which it stood for the sum of $900, but avers that a judgment was obtained against a third party, upon which an execution was levied upon the said mill, and the sheriff proceeded to sell the said mill, against the protest of respondent; that since said sale said judgment has been paid and satisfied, and any cloud created upon respondent's property has been removed. Avers that respondent has settled demands for taxes, except one old unsettled demand for taxes in the state of Oregon, amounting to about $600. Denies that J. R. Cook, W. E. Cook, and John S. Cook, or any of them, are insolvent, and not possessed of sufficient property to satisfy any judgment which might be levied against them. There are many other denials and averments in the answer, but those stated are sufficient to disclose the questions at issue.

On November 17, 1898, complainant, by leave of court, filed an amendment to the bill of complaint for the purpose of presenting its case in another aspect. In this amendment to the bill it is alleged, among other things: That at the time respondent entered into said mill and commenced its interference with complainant, on February 12, 1898, respondent declared that it did so because of the noncompliance of complainant with the terms of the lease requiring complainant to operate the said plant to its fullest capacity. Avers that respondent ought not to be heard to say that complainant had forfeited any rights by reason of its operation of the said plant, because during all of the time commencing with April 7, 1897, and ending with September 15, 1897, Hervey Lindley in good faith had operated the plant in accordance with his best and honest judgment that the plant should be operated in keeping with the best business interests of the parties to the lease, and from the 15th of September, 1897, to the unlawful interference by respondent, complainant continuously operated the said plant in a manner which, according to its judgment, was the only manner in which the plant could be operated to its fullest ca-

pacity in keeping with the best interests of both complainant and respondent; that the plan adopted by Lindley and complainant was adopted about the time the lease was executed, and thereafter the plant and property were operated continuously in accordance therewith; that this plan was fully known to respondent, and respondent had full knowledge of all that was done about the operation of said plant; that prior to February 12, 1898, no objection or complaint was ever made by respondent of the manner in which the lumbering plant was operated; that during the said time money was continuously expended by Lindley and complainant in accordance with said plan, and that no complaint was made, and no notice given by respondent to complainant, that the plan of operating said plant was not in accordance with the terms of said lease as understood by respondent; that no notice was ever given by respondent to Lindley or complainant that respondent ever claimed, or would claim, that Lindley or complainant had lost or forfeited any right under said lease, or that respondent would claim the right to or would enter upon the property under the right so to do in certain events provided in said lease; that up to February 12, 1898, respondent recognized that the lease was in full force and effect, and that Lindley and complainant were entitled to all the rights and bound by all the liabilities thereunder. Avers that the plan according to which the said plant was operated by Lindley and complainant had the approval of respondent up to the time of the unlawful interferences aforesaid; that, in order to operate said lumber plant, etc., according to said plan, it became advisable and necessary for complainant to enter into a contract for the purchase of timber lands in the neighborhood of the logging railway described in said lease, and that with the knowledge and according to the advice and instigation of respondent, complainant entered into a contract with the California & Oregon Railroad Company for the purchase of 14,000 acres of timber land, and agreed to pay therefor $6.50 per acre, making a total of nearly $90,000, for which amount complainant is liable under said contract; that, if the unlawful interferences complained of in the original bill are persisted in, complainant will have no use for said timber lands, and will suffer immense damages in this respect, which will be entirely irreparable and irrecoverable against respondent.

Upon the issues thus presented by the pleadings, the case was tried upon its merits in November, 1898. Witnesses were called and examined in open court, and documentary evidence introduced in support of the claims of both sides, and particularly with respect to the main question of fact whether on February 12, 1898, the complainant had incurred a forfeiture of the lease by reason of its failure during the preceding 10 months to operate the leased property as a lumbering business to its fullest capacity, in keeping with the best business interests of all concerned. The sawmill and appurtenances constituting part of the lumbering plant described in the bill of complaint are located at Klamathon, on the Klamath river, in Siskiyou county, Cal., near where the California & Oregon Railroad crosses the river. The remainder of the plant consists mainly of a log slide or chute about 2,700 feet long, 26 miles up the Klamath river, the franchise

for floating logs from the slide to the mill, and a logging railroad extending from the slide into the timber a distance of about 9 miles, together with an engine and a number of cars for hauling logs from the logging camp to the river. It is contended on the part of the respondent that the evidence shows that the mill at Klamathon has a capacity for sawing 70,000 feet of lumber per day of 10 hours each, or 1,820,000 feet each month of 26 working days, and that it had an aggregate capacity of 12,740,000 feet for the remaining 7 months of the year 1897 after the complainant's assignor entered into the possession of the plant on April 7th and was ready to commence work, and that logs sufficient to produce this amount of lumber and keep the mill continuously in operation could have been cut, loaded on the cars, hauled to the log slide, deposited in the river, and driven or floated to the mill during this period. The evidence shows that during these 7 months the mill was in operation only 22 days in the month of August, and that the amount of lumber sawed was 1,096,223 feet of the complainant's logs and 168,959 feet of logs belonging to the Klamath River Lumber Company (John R. Cook). Upon this evidence and testimony relating to the method adopted by the officers of the complainant for operating the plant, the respondent claims that there was a forfeiture of the lease at the time it undertook to regain possession of the sawmill and other property belonging to the plant.

As the conduct of several parties connected with the two corporations that are parties to this suit will be a subject of consideration in determining the questions at issue, it will be necessary to explain preliminarily their relation to the business and affairs of these two corporations. John R. Cook, the president of the respondent corporation, its manager and principal stockholder, purchased in 1892 the property located at Klamathon, which he afterwards developed into the plant in controversy. This development he accomplished by the investment of considerable capital of his own and the incurring of individual obligations in a large amount. These individual obligations appear to have been incurred in the name of the Klamath River Lumber Company, a name assumed by Cook for the purpose of carrying on his personal business. John R. Cook has two sons, William E. Cook and John S. Cook, who have assisted their father in the management of his business, and who have been and are stockholders in the respondent corporation. In the latter part of 1896 and the early part of 1897 John R. Cook found that his personal obligations in the name of the Klamath River Lumber Company had become so large, and of such a pressing character, that he was unable to continue the operation of the lumber plant successfully without financial assistance. At this juncture of affairs, Hervey Lindley, of Los Angeles, Cal., appeared at Klamathon, in January, 1897, and looked over the plant. In February, 1897, he appeared again, and opened negotiations for an option to lease the property, making such representations as to his ability to secure means to operate the plant that John R. Cook, on February 24, 1897, entered into such an agreement on behalf of the respondent corporation. This agreement provided for the terms of a lease, and provided further that Lindley or his assigns

should have until March 30, 1897 (afterwards extended to April 10, 1897), in which to accept or refuse the propositions contained in the agreement. Before this option expired, Lindley made an examination of the entire plant, and brought to Klamathon, among others, George Mason, of Los Angeles, who was to furnish the necessary funds to carry on the enterprise, if a lease should be obtained. The result of these examinations of the property and the attending negotiations was the execution of a lease of the property by the respondent to the complainant on April 7, 1897. The complainant contends that the evidence shows that it was understood between the parties to this lease that the first year was to be a preparatory year for the balance of the term, and that the special effort of the first season was to be directed to getting out a stock of logs for the active operations of the second year. This claim is based in part upon an added condition to the original option, dated April 1, 1897, providing for an extension of the term of the lease for a period of two years from March 30, 1902, as originally provided, to March 30, 1904. In his testimony Lindley explains the circumstances under which extension was made as follows:

"After we made this trip over the property, we came to Klamathon, and discussed the matter in the office with the Cooks. John R. Cook, W. E. Cook, and John S. Cook were there. They were all of them there off and on, and most of them all the time. Mr. Mason said that the time, as contemplated in the lease, was not sufficient to justify the putting in of the money that would be necessary to operate it, and that he would not feel inclined to go into the proposition on a five-year lease. He said: 'We are none of us lumbermen. Mr. Lindley has had some experience in lumbering, but none of us outside has, and he has got the trade to learn over again, as he has been out of the business a long while;' and he said: 'Unless there is a further extension put into this lease of two years, I would not care to engage in it.' It was on the statements made by him at that time that the extension of two years was provided for in the lease."

Lindley was asked if the shortness of the first season entered into consideration in making the extension. His reply was that "it did. The statement was made there by him (Mason) that this year had gone so far past that it could not be anything more than a preparatory year at best."

George Mason, in his testimony, gives the details of this conversation, as follows:

"I objected to the arrangement on account of the shortness of the time, and during that conversation I called attention to the fact that it was then getting along in the spring pretty well; that the roads were impassable; that there were scarcely any provisions at the camp, and none down below; and that the length of time that it would require before they could get provisions in there, and before the roads would be sufficiently dried so that they could be hauled up there, and before they could have moved their camp or built another, was necessarily a lot of time; that those things would necessarily take up a lot of time. Then I went on to explain to them that we were new in the business; that we none of us understood the business very well; that, while it was true that Mr. Lindley had previously had quite a good deal of experience in the retail business, even he had had no experience to amount to anything in manufacturing, and that we practically had the business to learn; that we had to close up our affairs where we were, and get moved up there. I told him that we would absorb so much time in those things,—in learning this trade; that the trade was not only new, but that the locality was new, and we had to become familiar with the surroundings, and had to look up and establish

markets; and all those things would require a great deal of time, and the first thing we would know the season would have slipped by, and very little lumber would have been cut."

John R. Cook testified that there never was anything said by Mr. Lindley about preparatory year or experiments, or anything of that kind; that Mr. Mason did intimate something of that kind, and the witness said:

"Gentlemen, if you want this property to experiment with, I don't want you to talk any more to me. We want money. It takes money to run a sawmill. If you don't want to put the money in, I don't want you to talk any more to me."

This witness was subsequently interrogated as follows:

"Mr. Lindley says that it was represented to you that they could not go to work that year: that the first year would be a preparatory year; and, upon that representation being made to you, you agreed to the extension for two years. Is that true? A. No, sir. Q. You say that is not true? A. No, sir; that is not true. Q. That you are certain about? A. That I am certain about. That is emphatically not true. Q. What did induce you to make this extension? You made it? A. Yes, sir. I cannot think of anything any further than Lindley talking to my oldest son, and insisting on his getting my consent to this extension for fear Mr. Mason might back out of the whole trade, and it would fall through. I can't think of anything else."

W. E. Cook, in his testimony concerning this same conversation, denies that anything was said about the first year being a preparatory or experimental year. He was asked the question:

"Was anything said about the first year being an experimental year? A. No, sir. Q. Was there anything said about extending the agreement in regard to using the first year for preliminary work, or anything of that character? A. No, sir. Q. When was it agreed upon that they should commence operations? A. They were to commence immediately. Q. And how should they run after commencement? A. To their fullest capacity. And they were to make certain improvements. They were to add a re-saw to increase the capacity that year."

John S. Cook testified that he was present during most of the time the negotiations were in progress which led up to the extension of the lease for the period of two years beyond the original stipulated time. He was asked what occurred. He said:

"The entire negotiations seemed to be hanging fire just about that time. Mr. Mason did not seem to be very anxious to go in, and my father did not seem to care very much about having him come in. Finally Mr. Mason said that he did not like the terms as they then stood, and he thought they needed more time all round; that the present one would probably be a short season, and if they decided not to buy, or not to extend the lease, that they wanted more time to clean up in. He said they would have a great deal of money in the business by that time, after these number of years of operating, and it would take some time to get this money out, and he did not want to put his money in on such a short term of lease. Q. What was said about the first year being experimental or preparatory, if anything? A. I don't remember anything of that kind at all. Q. Would you have remembered it if it had occurred? A. I think so; yes, sir."

He says, however, that about that time he was called into another room by Lindley. This testimony was not admissible as varying the terms of the written contract entered into by the parties at that time, but, considering it as showing the circumstances under which the contract was made, it certainly does not establish the

complainant's claim that the first year was to be a preparatory or experimental year. It does, however, show that under all the circumstances the first year would necessarily be a short season for the operation of the plant as a lumber-producing concern. But, giving this fact all the weight to which it is entitled, it is not sufficient to explain the failure of the complainant to operate the sawmill for more than 22 days during that year, and the consequent failure to produce altogether more than 1,265,181 feet of lumber. It appears that the respondent had operated the plant from March 2, 1893, to February 3, 1894, producing 7,340,000 feet of lumber; from June 9, 1894, to September 6, 1895, producing 13,064,000 feet; and from October 13, 1895, to October 13, 1896, producing 8,660,000 feet; and these operations were not profitable, because not sufficiently large. It is in evidence that it was for the purpose of securing sufficient capital to operate the plant up to its fullest capacity, as provided in the lease, that the contract now under consideration was entered into by the respondent. The failure of John R. Cook to manage his corporation successfully does not appear to have been by reason of any lack of experience or knowledge of the lumber business, but a lack of means to meet his current obligations while producing lumber and accumulating a stock on a large scale.

This brings us to the consideration of the testimony relating to the management of the plant by Lindley in his own name from April 7, 1897, to September 15, 1897 (when the lease was assigned to complainant), and as the manager of the complainant corporation during the remainder of the year 1897. The lease of the property by the respondent to Hervey Lindley was executed April 7, 1897, and on April 12, 1897, Lindley entered into an agreement with one David Horn wherein the latter agreed to commence logging immediately on section 31, township 40 S., range 5 E., W. M., situated in Jackson county, Or., cut timber as directed, and load the same on the cars at $1.85 per 1,000 feet, payable in cash on demand upon the scale certificate of logs having been loaded on the cars. There is testimony directed to the question whether it would not have been more advantageous to have commenced logging on section 29 in the same township, rather than on section 31, for the reason that the location of section 29 was claimed to have been such that a larger and earlier stock of logs could have been secured from it than from section 31; but the testimony does not establish the fact that logging could have commenced on section 29 any earlier than on section 31, but rather the contrary. It does appear, however, that section 29 was nearer the line of railroad, after the road was extended, than was section 31, and that after such extension logging was in fact carried on more rapidly than on the latter section. In this connection it is claimed by the respondent that the mill could have been started up, had reasonable diligence been exercised, in six weeks after the lease was made, and could have been kept continually running up to the date when the Cooks undertook to obtain possession of the plant, in February, 1898; and the fact that logs were not delivered to the railroad in the timber until six weeks after the signing of the lease, and none were delivered at the mill in quantity until a drive of logs

was made in the latter part of July and the first of August, shows, it is claimed, one of the failures on the part of Lindley to carry out the terms of the lease.   The sufficient answer to this claim is that Horn had been logging for the Cooks the previous year, and had the necessary horses, wheels, and gear constituting the outfit for this particular character of work, and no one else in that country had all these appliances.   It appears further that Lindley did endeavor to hurry the commencement of the work.   He urged Horn to commence bringing in logs as soon as possible, to use his men to the best advantage, and to get out as many saw logs as he could; and the latter testifies that he did the best he could, but the preliminary arrangements took time, and besides the ground was too soft to log before May 18th, when the logging did in fact commence.   This evidence does not appear to support respondent's claim that there was a failure at this time to carry out the contract.   It was apparently good judgment to commence logging on section 31, and logs were obtained from that section as soon as possible.   But, after logging had commenced, and had been carried on for a short time, Lindley does not appear to have been so urgent as at first in rushing the work to secure a large supply of logs for the mill during the first season. Horn's logging contract provided that he should cut timber as directed by Lindley.   Under this authority Lindley undoubtedly had the power to require Horn to work to the full capacity of his outfit, and even to enlarge it if necessary, to get out logs during the spring and summer in sufficient quantities to supply the mill to its fullest capacity for the whole season.   But, instead of pushing logging operations at a time when such activity would be of substantial advantage in securing early and continuous results in the production of timber at the mill, he limited Horn in the use of an outfit, and required that he should not use, on section 31, to exceed 24 head of horses and corresponding appliances.   This limitation reduced logging operations on this section to little less than the capacity of the railroad to transport the logs to the river.   Horn testifies that there were times when waiting for the loading of cars the trains were delayed, and at other times trips were lost.   Horn further testifies that when he first started logging Lindley was very anxious to have the logs in so he could get the mill started, and he hoped to keep it running, but later on Lindley told him that he was going to saw up what logs he could get into the river until they went down, and then he was not going to saw any more until next year.   Lindley testifies that he made no such statement to Horn.   Horn, on the other hand, testifies that Lindley's reputation for truth, honesty, and veracity is bad, and the testimony of Dr. G. W. Dwinelle is to the same effect. This last witness also testifies that in the summer of 1897 Lindley told him that he had operated the plant sufficiently to demonstrate that lumber could be produced at a profit, and that was all he cared to do that summer.   The deposition was taken of W. W. Hall, the foreman logger under Horn.   He testifies that he talked with Lindley about the logging, and advised him that they could do better to log first from section 29, and afterwards from section 31.   Lindley replied that he supposed they could, but he did not intend to do a great

deal the first year; he just intended to get ready, and log the second year. This conversation occurred about the middle of June. There is other testimony substantially to the same effect, but it is not necessary to pursue the subject further. The fact appears sufficiently established that there was no great effort on the part of Lindley to secure from the logging operations a full supply of logs for the mill for the first year.

Turning now to the railroad, we find in its later operations, during the season, evidence of the same purpose not to carry logs to the river so that they might be driven down the river to the mill in large quantities during the summer and early fall of 1897, but a design to postpone this work until the next season. The first logs were delivered at the railroad on May 19th, and these were hauled to the log chute or slide on the river and deposited in the river on the same day. The evidence shows the operations of the railroad as follows:

| | | |
|---|---|---|
| Logs hauled and placed in river between May 19th and 31st ................................... | 504,368 | feet. |
| Logs hauled and placed in river between June 1st and 24th .................................... | 913,288 | " |
| Logs hauled and placed in river between July 7th and 14th .................................... | 485,612 | " |
| Logs in river on July 14th................ | 1,903,268 | " |
| On July 14, 1897, the first drive of logs was made from the chute to the mill. The drive was completed on August 11, 1897, and resulted in delivering at the mill about................................. | 1,000,000 | " |
| Leaving in the river between the mill and chute | 903,268 | " |
| Logs hauled and placed in river between August 11th and 31st.................................... | 1,207,589 | " |
| Logs hauled and placed in river between September 1st and 22d.............................. | 995,787 | " |
| Logs in the river September 22, 1897, when cutting on section 31 had been completed...... | 3,106,644 | " |

Between May 19th and July 14th the railroad was in operation 35 days, and idle 13 working days. It is explained on behalf of the complainant that these idle days were caused by the breaking of the log chute. Between July 14th and September 22d the railroad was in operation 34 days, and idle 26 working days. It is explained that these idle days were also caused by the breaking of the chute, and the further fact that the railroad train was in the custody of the sheriff for the period of 10 days under an attachment against the property of John R. Cook. Deducting these 10 days when the train was in the hands of the sheriff as not properly chargeable to any fault of the complainant or his assignor, there remain 28 working days in a period of 4 months for which there is no explanation except that the train was stopped because the log chute was being repaired. It must be apparent that in an enterprise of this character, where

so many men were employed, and such large interests were involved, this explanation is not entirely satisfactory. There is testimony tending to show that the chute was not properly looked after, and that more care and attention in making timely repairs would have prevented much of the damage it received. This was probably the fact, but it is clear that the chute either ought not to break so often, or be repaired with less loss of time, if the plant as a whole was to be worked to its full capacity.

When cutting on section 31 had been completed, on September 22, 1897, there remained on that section logs skidded up alongside of the railroad to the amount of .................................... 342,527 feet.

Logging was then commenced on section 29, township 40 S., range 5 E., W. M., but these logs were not hauled to the river. They were skidded up near the railroad track, and kept there until the next year. The logs skidded were as follows:

| | | |
|---|---:|---|
| September 30th................................ | 135,705 | " |
| October 1st to 31st........................... | 2,423,016 | " |
| November 1st to 8th.......................... | 562,149 | " |
| Total logs skidded........................ | 3,463,397 | " |

Why were not these logs hauled to the river, and floated or driven to the mill during the months of September, October, and November? There were logs left in the river from the July drive amounting to about 903,268 feet, which would have made the total quantity about 4,366,665 feet. Lindley was asked this direct question when he was on the stand:

"Why did you not put any more in the river, and why did you not make a drive? State why you did not, and why you skidded the logs alongside of the railroad track." His reply was: "We made that one drive, and it was expensive. I talked with Mr. Will Cook in particular about it, and he advised me not to drive any more. We had in the river as many logs as we cared to take the chances of losing in the freshets in the winter rains. We did not dare put any more in the river for fear we would lose them. We thought the best way was to skid them along the railroad track. I instructed them to skid them here at the top of the log chute, but they failed to do it. They did skid them along the track, which was better than to drop them in the river, and take the chance of losing the logs by a rush of water in the winter time. They claimed that that river was susceptible to floods at certain seasons,—in January, and perhaps February,—and they have floods there that have taken large quantities of logs over the dam. When they go over the dam, they are lost."

Lindley's theory was that, as the river was subject to floods in January and February, the logs in the river at that time were liable to be carried down the river, and over the dam, and lost, and that the better policy was to accumulate a stock of logs at the log chute, on the river bank, and commence depositing these logs in the river as soon as the danger of a flood had passed in February, and continue this operation during the months of March, April, May, and June. In this way it was claimed that many logs would reach the mill without driving, and the expense under such circumstances would be from 15 cents to 25 cents per 1,000 feet, while driving the

96 F.—4

river later in the season, and during low water, would cost much more. He testified that the cost of the drive that was made in July, 1897, was 90 cents per 1,000 feet; that in 1898 four drives of the river were made, the first one commencing the latter part of May, and the last one ending in the fall. The aggregate of these drives was about 9,100,000 feet. The cost of the first drive, of 1,300,000 feet, was 35 cents per 1,000 feet; the second, of 2,700,000 feet, was 70 cents; the third, of 2,500,000 feet, was 90 cents; and the fourth, of 2,600,000 feet, was $1.25,—the average for the whole season of 1898 being 86 cents per 1,000 feet. It appears from this statement that the increase in the cost of driving the river as the season advanced and the water became low, which was an objection in 1897, was not an insuperable objection in 1898. If it was good policy to drive the river in 1898, even under an increase of expense, in order to furnish the mill with logs to keep it in operation, it would seem to have been good policy to have carried out this plan in 1897. Moreover, the decking of the logs by Horn alongside of the railroad in 1897 was an extra expense for which Lindley had to pay 25 cents per 1,000 feet. This expense would have been avoided if the logs had been hauled directly to the river. The excuse advanced by Lindley that the driving of logs down the river in the fall of 1897 would have been expensive is not, therefore, under the circumstances, a sufficient reason for keeping the sawmill in idleness for months after sawing up the small stock of 1,000,000 feet in August.

Lindley's next reason for not driving the river after August, 1897, was that William E. Cook advised him not to drive any more. William E. Cook testifies that he gave no such advice; and John R. Cook, whose experience and interest entitle his views to some consideration, testifies that he urged Lindley to keep putting in more logs. He was of the opinion that the river could be driven every day of the year, and that the work should not be stopped. Lindley's next reason for not keeping logs moving down the river in the fall was that they had in the river as many logs as they cared to take the chances of losing in the freshets in the winter rains. These freshets, he says, were liable to occur in January and February; but, notwithstanding his apprehension in this respect, it appears that the railroad did commence hauling logs again on December 28, 1897, and between that time and February 10, 1898,—the most dangerous period of the year,—there were placed in the river a stock of logs amounting to 927,758 feet, which, together with the logs already in the river (3,106,644 feet), made an aggregate of 4,034,402 feet of logs in the river during all the winter months. Whatever danger there may have been in the loss of a considerable quantity of logs from freshets in January and February was, therefore, in fact incurred by the accumulation of this large stock of logs in the river. It is manifest that under these conditions the safer course was to have driven these logs down the river to the mill, and had them taken out and sawed into lumber; and this was precisely the plan of operation pursued during the season of 1898, when, notwithstanding the water was lower in the river than in 1897, over 9,000,000 feet of logs were driven down the river between May and Novem-

ber, and at the latter time no considerable number of logs remained in the river in danger of being lost, while a large stock of lumber was accumulated at the mill for the market. Now, if, in addition to driving the 3,106,644 feet of logs that were actually placed in the river prior to September 22, 1897, the logs skidded in the timber prior to November 8, 1897, and amounting to 3,463,397 feet, had also been hauled to the river as they were being cut, and the whole stock of 6,470,041 feet driven down during October and November, the driving would have been entirely safe, and there would have been a saving of expense, not only in the amount paid for skidding the logs in the timber, but in the less expense proportionately for making large instead of small drives. This method of operating the plant would have kept the mill running to its full capacity for four or five months during 1897, and placed lumber on the market with profit to all concerned, leaving six or seven million feet of logs in the timber with which to commence operations in the following spring. In determining that the plant could have been operated successfully in this way during the season of 1897, and should have been so operated to comply with the terms of the lease, the fact is not overlooked that after September 22, 1897, the railroad was extended a distance of a mile and a half or two miles through section 29 and into section 19, and that the rolling stock of the road was used to carry rails and ties in this work of construction; that there was also during this time some repairing done to the main line and to the rolling stock of the road; but it does not appear that this work need to have interfered with the hauling of logs to the river for any great length of time, and certainly cannot be considered as any excuse for suspending the operations of the railroad for a period of four months.

But another aspect of this case remains to be considered. The Cooks resided at Klamathon, and during the season of 1897 they observed the plan pursued by Lindley and his associates in carrying on the work and business affairs of the plant, and, while it is true that John R. Cook continually urged Lindley to adopt methods of operation that would have secured more immediate and possibly better financial results, he gave no notice or warning to the lessee that he would claim a forfeiture of the lease until he and his sons undertook to regain possession of the plant on the night of February 12, 1898. When the placing of logs in the river from section 31 was suspended, on September 22, 1897, the Cooks knew that no more logs were to be driven down the river that season, and no more lumber could be sawed at the mill until the next season. Indeed, this fact was known to John R. Cook as early as September 1, 1897, when Mason testifies that he had a conversation with Cook about the operations of the plant, and the latter complained that Lindley had promised to assist him in getting a loan, and had failed to do so. Mason says:

"He [Cook] said he might be mistaken; he hoped he was (the old gentleman talked very nicely about it); but he said he did not think Mr. Lindley was going to be a success in the business. I asked him why, and he said there was not being as much accomplished as there should be; that we had virtually

gotten through sawing, and that there would not be any more cut. That was understood in our conversation,—that they would not do anything to saw any more that year,—and he seemed to think there had not been as much accomplished in that way as there should have been. I called his attention to the conversation that we had had in the spring, and told him that we had gotten along about as well as I had supposed we could in getting ready; and when I called his attention to that conversation it seemed to change his mind quite a good deal."

Here was a period of more than six months, during which time all the facts were present upon which a forfeiture could be claimed by the respondent on the ground that the plant was not being operated as a lumbering business to its fullest capacity, but the Cooks stood by during all this time, and made no move, except that John R. Cook, in September or October, communicated to one of his Eastern creditors the information that the contract was not being carried out, and he believed that it was going to be a "freeze out." This information appears to have been the commencement of negotiations with other parties for the formation of a corporation to operate the plant after possession had been obtained by the forcible seizure of the mill and appurtenances as finally executed by the Cooks on the night of February 12, 1898. But all these proceedings prior to the assertion of a claim of forfeiture of the lease were carried on without the knowl-·edge of Lindley or his associates. The bad faith involved in these proceedings on the part of the Cooks is disclosed by a brief statement of some of the acts of Lindley and his associates in carrying out the terms of the lease upon the plan of operations adopted by them. One of the reasons given by John R. Cook for leasing the property was that it could only be operated successfully by the investment of a large amount of capital. There is no complaint that this was not done by the lessee. It appears from the testimony that prior to February 12, 1898, the complainant had expended upon the plant and in securing the stock of logs then on hand upward of $70,000, and the only means it had for reimbursing itself for this outlay were these logs and the proceeds from the sale of about 1,000,000 feet of lumber. The value of the logs to the complainant was dependent almost entirely upon having possession of the mill, and being able to cut them into lumber, since there was no other mill in the neighborhood. With the mill in the hands of the respondent or a corporation under the control of the Cooks, the complainant would be helpless to protect itself in disposing of this large quantity of logs. It appears further that no timber lands were included in·the lease, but logs were obtained by the complainant from lands purchased from the California & Oregon Railroad Company, the complainant succeeding to the interest of the Cooks in certain contracts between them and the railroad company. The last of these contracts assumed by the complainant was for the purchase of 13,851 acres of timber land at $6.50 per acre, amounting to $90,000, and the contract between the complainant and the railroad company was dated December 6, 1897. But not only did the Cooks give a passive assent to these extensive preparations for future operation of the plant, but it appears that they conferred with Lindley with respect to certain details. About September 24, 1897, Lindley visited the East to see about the placing of lumber in

the Eastern markets, and to ascertain whether it would be safe to make a large cut of lumber with any expectation that a market could be found for it.   On Lindley's return, about November 21st, he stopped at San Francisco to examine a donkey engine to be used in the woods for logging purposes.   When he arrived at Klamathon, about November 24th, he repeated to the Cooks what he had found in the East, and the prospects of the lumber market.   He also conferred with them at that time about the advisability of purchasing a donkey engine for use in the woods when the ground was soft, and wheels could not be used, and he exhibited the cut of one he thought suitable for the work.   John R. Cook advised the purchase of a better one, on the ground that the best was the cheapest, regardless of cost.   Lindley purchased the one he had examined at a cost of between $1,700 and $1,800, and when it arrived at Klamathon the Cooks assisted in unloading the engine from the cars and loading it onto wagons for transportation to the woods.   On October 15, 1897, James Steel, the secretary of the respondent corporation, located at Portland, Or., addressed a communication to Lindley, as the manager of the complainant, demanding a statement of the business, as follows:

"Hervey Lindley, Esq., Klamathon, Cal.—Dear Sir:   Please prepare and forward a statement of the business of the Klamath River Lumber & Improvement Company from the time you took possession under your lease until the present time, showing condition of the business under your management.   This request is made upon you under the terms of the lease.   Your prompt attention and compliance with this request will greatly oblige,

"Yours, very truly,
"Klamath River Lumber & Improvement Company,
"By James Steel, Secretary."

It will be observed that it is expressly stated that the demand is made under the terms of the lease.   This communication was acknowledged by Lindley under date of November 22, 1897, and a statement forwarded in a letter dated December 17, 1897, as follows:

"James Steel, Esq., Secretary Klamath River Lumber & Improvement Co., Portland, Oregon—Dear Sir:   In accordance with your request, we hand you herewith balance sheet December 1, 1897.   We have everything in good shape for a business of 15,000,000 this year, and have 10,000,000 logs now cut.   Will start the mill in January, weather permitting.   Hope to have a railroad from mill to timber next season.   The river is the trouble here.

"Yours, truly,                                    Hervey Lindley, Manager."

A further statement was called for by Steel under date of December 21, 1897, to which Lindley replied, under date of December 24, 1897, as follows:

"James Steel, Esq., Secretary Klamath River Lumber & Improvement Co., Portland, Oregon—Dear Sir:   Your letter 12/21/97 at hand, and in reply to your inquiry as to general information about the business we are doing will say we sawed in all a little over a million of our own stock.   Getting a late start, and everything disorganized, we could only make this year virtually a preparatory year for the coming one, and we hope, barring accidents, to cut 15,000,000 this coming year, and expect we have 10,000,000 now cut, and expect to start the mill in January, and run it ten months, and hope we may get good results, and, with market as at present, prospects are good.   We have had a great deal of expense, almost as much as we should have for a full year's business, and this plant can only be operated on a large scale to pay,

and we will try that, and see if that can be made profitable. With compliments of the season, and expressing our desire to hear from you often,
        "Yours, truly,                                Hervey Lindley, Manager."

To these statements by Lindley as the manager of the complainant no objection was made by the respondent, and no complaint made that the lease had been forfeited. About the 4th or 5th of February, Lindley had a conference with John R. and William E. Cook concerning the addition of a box factory to the plant. There was one already on the premises, not in use, belonging to the Pioneer Box Factory, holding a lease from the respondent. The Cooks undertook to negotiate on behalf of the complainant for the right to use this factory in connection with the sawmill, and one of them did write a letter in this behalf to the party controlling the right; but pending further negotiations the mill and other property belonging to the plant was seized by the Cooks in the interest of a combination to which they were parties, and formed for the purpose of operating the plant when possession of it should be obtained.

Assuming that the complainant failed to fully perform the conditions of the lease entered into with the respondent, as stated in a former part of this opinion, and that this failure resulted in the right of the respondent to demand a forfeiture of the lease in September, 1897, it is nevertheless clear that the subsequent transactions just related give to the case a different aspect. Every consideration of right and justice required that under the circumstances the forfeiture should have been asserted promptly, and a return of the property demanded as soon as the default of the complainant had become an established fact. But here we have the officers of the respondent standing by while large expenditures were being made for the benefit of the plant, and dealing with the manager of the complainant with respect to important matters with every appearance of assenting to the continuance of preparations for the future operation of the plant on a large scale. The fact that John R. Cook persisted in his objections during the season of 1897 that the plant was not being operated successfully, or to its full capacity, is not sufficient. He knew all the facts, and should have asserted then the right of forfeiture now claimed by the respondent as a defense to this action. It is assumed that Cook's complaints were not merely personal, but that he represented the respondent in his relations with the complainant and in his dealings with its officers. This conduct, under the circumstances, amounted to a waiver of the forfeiture, and the respondent will be estopped from afterwards exercising its legal right to claim it in opposition to such waiver. Bishop, in his work on Contracts (Enlarged Edition) states the rule, in section 792, as follows:

"Waiver is where one in possession of any right, whether conferred by law or by contract, and of full knowledge of the material facts, does or forbears the doing of something inconsistent with the existence of the right or of his intention to rely on it. Thereupon he is said to have waived it, and he is precluded from claiming anything by reason of it afterwards."

In Swain v. Seamens, 9 Wall. 254–274, the rule is stated in the following language:

"Where a person tacitly encourages an act to be done, he cannot afterwards exercise his legal right in opposition to such consent, if his conduct or acts of encouragement induced the other party to change his position, so that he will be pecuniarily prejudiced by the assertion of such adversary claim."

This doctrine is too well established, and the cases where it has been applied too numerous, to require any further reference to authorities. It is sufficient to say that it is peculiarly applicable to the facts of the present case, and determines that the respondent was not, under the circumstances, in a position to demand a forfeiture of the lease, or disturb the complainant in its possession of the leased property on February 12, 1898, because of the failure of the latter to operate the plant to its fullest capacity prior to that date. In this view of the case, other questions discussed by counsel in their briefs need not be considered.

The question of the equitable jurisdiction of this court was necessarily involved in the motion to modify the restraining order (Pokegama Sugar Pine Lumber Co. v. Klamath River Lumber & Improvement Co., 86 Fed. 528), and in the proceedings for contempt (Id. 538), and, while not discussed in the opinion, was considered and determined in favor of the equitable jurisdiction of the court.

The respondent contends that upon the facts stated in the bill of complaint there was for the injury complained of a remedy at law. Section 723 of the Revised Statutes provides that suits in equity shall not be sustained in either of the courts of the United States in any case where a plain, adequate, and complete remedy may be had at law. Under this statute the remedy at law, in order to exclude equity, must be as practical and as efficient to the ends of justice and its prompt administration as the remedy in equity. Boyce's Ex'rs v. Grundy, 3 Pet. 210, 215; Insurance Co. v. Bailey, 13 Wall. 616, 620; Tyler v. Savage, 143 U. S. 79, 95, 12 Sup. Ct. 340. In the present case the prompt interposition of a court of justice was imperative to preserve the property for the benefit of both parties. The respondent had taken possession of the property without regard to the requirements of law in such proceedings, and for a time maintained the possession thus illegally obtained by the display of force. The court cannot close its eyes to the real meaning and character of such proceedings. They were inaugurated in defiance of law, and were meant to be maintained against its ordinary processes. This is shown conclusively by the fact that this court was only able to enforce its orders at first by resort to the power of punishment for contempt, and any delay or hesitation at this time would unquestionably have resulted in the destruction of valuable property, and possibly in the loss of life. But it is contended the complainant might have proceeded in the proper court, under a statute of this state, for forcible entry or forcible detainer. The diverse citizenship of the parties entitled the complainant to come into this court with its cause of action, and obtain the remedy which this court has the power to give. The civil action of forcible entry and detainer has been provided by the law of this state, but not by the laws of the United States. The remedy at law that will oust this court of its equitable jurisdiction is not what may be found in the state laws, but

what was provided in the common law as it existed in this country when the judiciary act of 1789 was enacted, or in some act of congress providing such a remedy. Robinson v. Campbell, 3 Wheat. 212; Boyle v. Zacharie, 6 Pet. 658; McConihay v. Wright, 121 U. S. 206, 7 Sup. Ct. 940; Cropper v. Coburn, 2 Curt. 465, Fed. Cas. No. 3,416; Railway Co. v. Elliott, 56 Fed. 772. The civil action of forcible entry and detainer did not prevail at common law, and has not been provided by congress.

The action of ejectment is subject to the objection that it did not afford an adequate remedy. As against the legal forfeiture of the lease claimed by the respondent, the complainant asserted certain equities to defeat respondent's right of possession based upon such forfeiture. But in an action of ejectment in a United States court, where the legal title prevails, such equities could not be considered. Miller v. Courtnay, 152 U. S. 172, 14 Sup. Ct. 517; Carter v. Ruddy, 166 U. S. 493, 17 Sup. Ct. 640. I think it sufficiently appears from the testimony that complainant would have suffered irreparable damage had not the respondent been enjoined from committing the acts of interference complained of in the bill of complaint. The facts need not be repeated. They have been sufficiently referred to in this opinion and in the previous opinions that have been rendered in the progress of this case. Here is a large plant, embracing various properties, depending for its success and value upon capital and management, the supply of timber, and the conditions of distant markets. The complainant had furnished the necessary capital, found a profitable market, and, independently of the lease, had secured and obligated itself to purchase a large tract of timber land, which, at that time, at least, furnished the only supply of logs in quantity accessible to the mill. The possession of the mill by the respondent under its claim of right would have given it no claim or title to these timber lands. What, then, could it have done in the way of operating the plant, under the existing conditions, except to make more certain the condition of financial embarrassment from which it and its principal stockholders were trying to escape? The fact that a new corporation was to take hold of the property simply furnishes additional evidence that whatever damages the complainant might suffer by the proceedings would be irreparable.

Let a decree be entered in favor of the complainant in accordance with this opinion.