POKEGAMA SUGAR–PINE LUMBER CO. v. KLAMATH RIVER LUMBER
& IMPROVEMENT CO.

(Circuit Court, N. D. California. April 18, 1898.)

No. 12,578.

1. RESTRAINING ORDER—MANDATORY IN EFFECT.
    Where sufficient grounds exist, a court of equity has the power to, and will, issue, on a preliminary application, a restraining order, though mandatory in effect and requiring affirmative action.

2. SAME.

> Where the respondent, under claim of right, enters by force upon property in the possession and management of complainant, and drives him away, and assumes control of the same, an order restraining the respondent from interfering with complainant's management and control of such property will not be modified, though in its practical operation it is mandatory, and necessitates affirmative action on the part of the respondent in surrendering the possession he had thus attained.

This was a bill for injunction by the Pokegama Sugar-Pine Lumber Company against the Klamath River Lumber & Improvement Company. The cause was heard on a motion to modify the restraining order.

E. S. Pillsbury (F. D. Madison and James F. Farraher, of counsel), for complainant.

F. S. Stratton (S. C. Denson, W. W. Kaufmann, H. B. Gillis, and James R. Tapscott, of counsel), for respondent.

MORROW, Circuit Judge. It is alleged in the bill of complaint that the complainant is a corporation, organized under and by virtue of the laws of the state of California, for the purpose of carrying on a general lumbering business, operating mills, railroads, chutes, tramways, and all other structures, appurtenances, and appliances necessary and proper for the conduct of said business, and, as such corporation, has ever since the ——— day of September, 1897, been engaged in carrying on a lumbering business in the county of Siskiyou, in this state; that the respondent is a corporation organized and existing under the laws of the state of Oregon, for the purpose of carrying on a general lumbering business, and, as such, has been engaged in doing business in the state of California, has acquired property in said state, and is now doing business therein; that on the 21th day of February, 1897, the respondent and one Hervy Lindley entered into an agreement in writing whereby the respondent agreed to lease to said Lindley, or his assigns, the entire lumber plant situated in Siskiyou county, Cal., and Klamath county, Or., consisting of pine lands, logging railway and equipments, log slide, all rights of way and franchises, and booms and improvements, in the Klamath river, sawmill and sawmill property, yard, tramways, switches, and all lands and appurtenances thereto belonging, planing mills, sheds, and lands connected therewith, office, barn, and all fixtures therewith connected, teams, wagons, harnesses, and in fact all appurtenances to respondent's lumber business either at Pokegama (Klamathon), or in the lumbering camps, or wherever located, as the property of the company, for the term of two years from and after the 30th day of March, 1897. The consideration for the lease was a certain division of the profits, and it was further provided that Hervy Lindley, or his assigns, should have the privilege of continuing the lease on the same terms to March 30, 1902, and this privilege was further extended to March 30, 1904. It was also provided that Lindley should have the right until March 30, 1897, to accept or reject the proposition contained in the agreement to lease; and, if accepted, the Klamath River Lumber & Improvement Company agreed to execute a lease in accordance with the terms of the agreement. The time for this acceptance by Lindley was extended to April 10,

86 F.—34

1897, and prior to that date Lindley accepted the agreement; and accordingly, on April 7, 1897, the Klamath River Lumber & Improvement Company made, executed, and delivered to Lindley a lease for all the property described in the agreement of February 24, 1897. The bill further alleges that, upon the execution of this lease, Lindley signed and accepted the same, and entered into possession of the property, and immediately undertook its management and operation as a lumbering business; that, on the 15th day of September, 1897, Lindley sold, assigned, transferred, and made over, for a valuable consideration, to the complainant, the said instrument in writing, and all his right, title, and interest therein and thereunder, and thereupon complainant entered into the possession of all said property as the assignee and successor in interest of Lindley, and thereafter conducted, operated, and carried on the plant and lumbering business, pursuant to the terms of the lease, until the interference and interruptions described in the bill. The bill describes the lumbering plant and its appurtenances on the Klamath river, a log slide or chute on the river about 24 miles above the sawmill, and a railroad about 9 miles long, with rolling stock, used for the transportation of logs from the timber lands to the log slide or chute. It is alleged that between the 7th day of April, 1897, and the —— day of February, 1898, Lindley and the complainant cut, and caused to be cut, 15,000,000 feet of logs, to be sawed at the sawmill during the sawing season of the year 1898; that about 4,500,000 feet were in the woods adjacent and contiguous to the railroad, about 6,000,000 feet alongside of the railroad, ready to be loaded upon the cars, and about 4,500,000 feet were in the Klamath river at Klamathon, and about 1,000,000 feet in the booms connected with the mill; that, in the cutting and preparing said logs for the mill, the complainant had expended more than $50,000, and had also expended more than $20,000 in equipping the mill, railroad, and other portions of the plant; that the sawing season for the year 1898 began on or about the —— day of February, 1898, at which date complainant had the sawmill and plant in complete readiness for the sawing season; that on the —— day of February, 1898, and in the nighttime, the respondent, acting by and through its president, J. R. Cook, and W. E. Cook and John S. Cook, as directors and agents of the respondent, violently and by force of arms entered into the said sawmill, drove the watchman of complainant out of the mill, and excluded the complainant therefrom by force and violence, and then proceeded to block up said mill, and in such manner as to prevent the use thereof, or the taking of logs from the booms or lumber from the yard, by barricading the openings of the mill; that, in forcibly taking and occupying said sawmill, the respondent employed not only its president, J. R. Cook, and its directors and agents, W. E. Cook and John S. Cook, but also from four to six fighting men, who entered into the mill in the nighttime, armed with shotguns and rifles, and drove the watchman of complainant therefrom by threats and violence, and have ever since remained therein, armed with shotguns, rifles, and ammunition, and have ever since, by force and threats and by the exhibition of firearms, excluded the complainant, its agents, representatives, and employés, from the mill, and prevented the use and occupation thereof by complainant; that the

acts and doings of respondent were not preceded by any peaceable entering upon the property, or any part thereof, or any attempt to make such entry, or any demand upon complainant for the possession of the same, or the privilege of entering thereon, or any complaint that Lindley or complainant had failed to keep or perform any of the covenants or conditions of the lease; that, on account of the violent and unlawful acts of respondent, the complainant has suffered great and irreparable injury by delay and interference in the prosecution of its lumbering business, and, unless respondent be enjoined and restrained from a continuance of its unlawful acts, complainant will suffer still greater and further irreparable damage and injury; that the season for floating logs down the Klamath river will expire on or about June 1, 1898; that the water in the river is unusually low for this time, and there is every reason to expect that the season for floating logs will be shorter during the current year than usual, and the water will thereafter be too low for successfully driving or floating logs; that, if the logs already cut are not hauled, taken to said sawmill, and sawed during the present logging season, they will deteriorate at least 50 per cent. in value, and, if not used in 1899, they will be a total loss; that the said sawmill is the only one available to complainant, and the only mill to which the logs can be delivered; that there is no sale for said logs and no use for the same except to be worked at said mill; that, by the wrongful acts and interferences of the respondent, the complainant has been, and is, subjected to a daily expense of $100 or more, which is a dead loss to complainant; that respondent threatens to continue its interruptions and annoyances, and will continue the same, unless enjoined and restrained by this court; that the respondent is insolvent and wholly unable to respond in damages on account of the unlawful acts and injuries mentioned, and complainant has no plain, speedy, or adequate remedy at law against the wrongful acts of the respondent. The prayer of the bill is that an injunction may issue, restraining and enjoining the respondent, its successors, officers, attorneys, agents, and servants, and each and all of them, from in any manner interfering with, impeding, or hindering, and from causing to be interfered with, impeded, or hindered, the complainant in the occupation, conduct, transaction, and management of its lumbering business in the county of Siskiyou, state of California, and, in the meantime and until the hearing, the complainant may have an injunction pendente lite, embracing all the relief prayed for in the bill.

Upon the filing of the bill, on the 17th day of March, 1898, an order was issued requiring the respondent to show cause why an injunction pendente lite should not be granted, and, upon the complainant giving a bond in the sum of $10,000, the respondent, its officers, attorneys, agents, and servants, were restrained, in the meantime, from in any manner interfering with, impeding, or hindering, and from causing to be interfered with, impeded, or hindered, the Pokegama Sugar-Pine Lumber Company, its successors, officers, attorneys, agents, or employés, or any of them, in occupying, conducting, managing, and carrying on all the property mentioned in the lease.

It appears, from the return of the deputy United States marshal, that this order was served at Klamathon, in Siskiyou county, on the 21st day of March, 1898, on the Klamath River Lumber & Improvement Company, by delivering an attested copy of the order to and leaving with John R. Cook, as its president and managing agent, and on John R. Cook, John S. Cook, and W. E. Cook, as its directors and agents, and on H. B. Gillis, as its attorney, at the same time showing to each of them the original order. It appears, further, from the affidavit of the deputy United States marshal, that, upon visiting the office mentioned in the bill of complaint as a part of property at Klamathon leased to the complainant, he found it occupied by John S. Cook and W. E. Cook; that he served the order upon them there, and then departed to find John R. Cook. After serving the latter, the deputy marshal returned to the office, where he met with forcible resistance on the part of W. E. Cook and one George W. Marsh, who endeavored to prevent the deputy marshal from entering the office and to eject him therefrom after he had entered. The deputy marshal then visited the mill for the purpose of making service of the order, but, on arriving at that place, he found the door leading into the mill locked or barricaded, and stationed thereat and within the mill were a number of persons, four or five of whom he saw through the window, and who were in charge of John S. Cook, whom the deputy marshal had previously served with the restraining order. These persons refused to permit the officer to enter the mill for the purpose of making the service. The order was thereupon read aloud in the hearing of the parties, and the officer again demanded admission and was refused. Afterwards the deputy marshal demanded admission to the mill for the purpose of posting within the mill a certified copy of the restraining order, and he was again refused admission. Later in the day the deputy marshal served a copy of the restraining order upon H. B. Gillis, the attorney for the respondent. The deputy marshal, in his affidavit, alleges that Gillis stated to him that he would not recognize the restraining order, and that he had advised his client, the respondent, not to recognize the provisions of the restraining order, and not to allow the complainant, its officers and agents, to occupy the property mentioned in the order, and not to permit or allow it to conduct and carry on the business therein mentioned. This allegation has since been modified by the deputy marshal to the effect that Gillis stated that he did not see anything in the restraining order which warranted his clients in giving up the possession of the property, and he would so advise them. Upon the return of the deputy marshal, and the statements contained in his affidavit, an attachment was issued by the court for the arrest of J. R. Cook, W. E. Cook, John S. Cook, H. B. Gillis, George W. Marsh, and two others, to show cause why they should not be punished for contempt of court in disobeying, and aiding and abetting the violation of, the restraining order of this court. Subsequently, upon affidavits showing that resistance to the order of the court was being continued by others, attachments were issued, until 27 persons were placed under arrest.

Upon the hearing in the contempt proceedings, it was shown that counsel for respondent, without admitting any violation of the order of the court, had advised its officers and agents on March 29, 1898, to do no act which, under any construction that might thereafter be placed upon the restraining order, could be the basis for a finding by the court that from that date it had interfered, impeded, or hindered the complainant in occupying, conducting, managing, and carrying on the property mentioned in the lease, and, in accordance with this advice, the possession of the property was practically surrendered to the complainant.

This brings us to the consideration of the motion made by counsel for respondent, that the restraining order be so modified that the same shall not, in any manner, affect the status quo of any and all matters involved in this litigation up to the filing of the bill of complaint; that the respondent be not required to surrender the possession of the mill, office, and barn mentioned in the bill of complaint; that the complainant be ordered and directed to restore all of the property mentioned in the bill to the same condition, as regards possession thereof, as the same was in at the time of the filing of the bill, in so far as such possession may have been changed or affected by any order of the court. This motion is based upon the contention that the court, by its preliminary restraining order, could not undo that which had been done, or change the status of the property from the condition in which it existed at the time of the commencement of the action.

It is to be regretted that the original counsel for respondent did not adopt this method of procedure, to ascertain the scope and purpose of the restraining order, rather than advise or allow his clients to assume an attitude of armed resistance to the order of the court; but that feature of the case need not be further considered in passing upon the respondent's motion to modify the injunction.

It is contended that the injunction, although preventive in form, was mandatory in effect, its execution resulting in a change in the status of the parties. This contention assumes that the court will recognize the respondent as asserting, at the time the bill was filed, a claim of possession to the property under a color of right to such possession, and that the effect of the order was to oust it from that possession. But equity will not permit a mere form to conceal the real position and substantial rights of parties. Equity always attempts to get at the substance of things, and to ascertain, uphold, and enforce rights and duties which spring from the real relations of parties. It will never suffer the mere appearance and external form to conceal the true purposes, objects, and consequences of a transaction. Pom. Eq. Jur. (2d Ed.) § 378.

Looking at the real situation of the parties to this controversy, what do we find? The respondent, in April, 1897, enters into an agreement with the assignor of the complainant, whereby it leases, for a number of years, a large and valuable lumbering plant, consisting of pine lands, logging railway and equipments, log slide, rights of way, franchises, booms, and improvements, sawmill and

sawmill property, planing mill, office, yard, tramways, and switches, barn and fixtures connected therewith, teams, wagons, and harnesses, and all the appurtenances connected with a large lumbering business. The lessee enters upon the possession, control, and management of this large property, and, after a time, under the terms of the lease, assigns to the complainant. The original lessee and the complainant expend large sums of money in placing this property into practical business operation, and, just at the time when the second season is about to commence, the respondent, by its officers and agents, without notice, demand, or warning, undertakes, by force and arms, to repossess itself of the property. It is charged in the bill that the cause and purpose of this violent and forcible entry were to compel complainant to abandon the premises because the respondent has entered into a contract for the sale of the property to another party at a high figure, provided it could deliver possession thereof to the proposed purchaser. This allegation of the bill is not distinctly denied in any of the affidavits that have been filed in the proceedings for contempt. The only justification claimed for the conduct of the officers and agents of the respondent, in entering upon the property, is that the lessee failed to comply with the terms of the lease providing that the plant should be operated as a lumbering business to its fullest capacity, in keeping with the best business interests of the parties thereto and to its profitable operation, and that, upon the failure of the lessee or his assigns to perform any of the covenants on his part to be done and performed, then the respondent had the right at once to re-enter upon any part of the premises in the name of the whole, and might forthwith determine the tenancy created by the lease without prejudice to other remedies. In other words, the respondent assumed to determine for itself that a forfeiture of the lease had been incurred; that it had thereby succeeded to large and valuable interests and improvements placed upon the property by the lessee and his assignee; and that it had, by reason of such forfeiture, acquired the right to re-enter, drive away the employés of the complainant, and maintain possession of the property by force and arms. A court of equity will not fail to see in such a possession a mere form to hide from view the unlawful character of the proceedings by which the possession was gained, and, whatever may be the substantial rights of the parties in their true relation under the contract, the court will not give its sanction to such proceedings. Moreover, a court of equity will relieve against a forfeiture where it is made to appear that its principal intent and purpose was to secure a performance of the contract, and compensation can be effectually made for the actual damages incurred. 1 Pom. Eq. Jur. § 381; Civ. Code Cal. § 3275. This rule, resting upon the maxim that he who comes into equity must do equity, and must come with clean hands, would deny to the respondent a forfeiture, upon its own showing, if that were the issue now being tried in this court. It is clear, therefore, that the asserted right of possession, which respondent seeks to maintain in these proceed-

ings, cannot be recognized by the court as anything more than a mere trespass and an interruption of the prior possession of the complainant.

It appears that, prior to the commencement of proceedings in this court, complainant commenced an action of a similar character against the respondent in the superior court of Siskiyou county, in this state; that an injunction was issued commanding the respondent to refrain and desist from excluding complainant or its agents from any portion of the sawmill and lumbering plant in controversy, and from in any way interfering with the full and complete possession and enjoyment, by the complainant, of any or all of the said property. The respondent refusing to comply with this order, its officers and agents were cited by the superior court to show cause why they should not be punished for contempt. The defendant demurred to the citation and moved to dismiss the injunction. The court, in a carefully prepared opinion, held that it was not intended, by the injunction, to restore the possession to the complainant to the possession of the mill or other property; that the purpose of the injunction was to hold the subject of the litigation in status quo until a final determination of the controversy. In arriving at this conclusion the court points out that section 525 of the Code of Civil Procedure of this state provides that "an injunction is a writ or order, requiring a person to refrain from a particular act," and that the mandatory ingredient of an injunction, found in nearly all the definitions of text writers, is entirely omitted from the Code definition of an injunction. It is not necessary to inquire whether the authorities cited by the court support the conclusion that, under the Code of this state, the court had no power to grant the relief prayed for by the complainant. The opinion of the court is entitled to respectful consideration in interpreting the laws of the state, but this court is not, in this character of proceedings, subject to the limitations of the Code provisions of the state. The source of the general equity jurisdiction of United States courts is found in the principles established by the high court of chancery in England, and recognized by the courts of the United States as applicable to the existing conditions in the United States. In the case of Toledo, A. A. & N. M. Ry. Co. v. Pennsylvania Co., 54 Fed. 746, a bill in equity was filed in the circuit court for the Northern district of Ohio, and a mandatory order was asked and allowed by the judge of that court, enjoining the respondents from refusing to extend to complainant the same equal facilities as to others for the exchange of interstate traffic. It was objected that the order was mandatory in effect, and that the circuit court had no right to issue such an order upon a preliminary application. The court held that its authority to issue the order rested on well-established principles; citing, among other cases, that of Beadel v. Perry, L. R. 3 Eq. 465, where a mandatory injunction was granted, on motion, by Sir John Stuart, vice chancellor. In giving judgment in that case, the vice chancellor said:

"Reference has been made to a supposed rule of court that mandatory injunctions cannot properly be made except at the hearing of the cause. I never heard of such a rule. Lord Cottenham was, so far as I know, the first judge

who proceeded by way of mandatory injunctions, and he took great care to see that the party applying was entitled to the relief in that shape."

The mandatory order of the circuit court of Ohio, in the case cited, was violated by one Lennon, a locomotive engineer, who was found guilty of contempt of court in disobeying the order, and was fined $50 and costs. Thereupon Lennon filed a petition in the same court for a writ of habeas corpus, alleging, among other things, that the circuit court had no jurisdiction to make the order, because it was beyond the jurisdiction of a court of equity to compel the performance of a personal contract for service and to interfere by mandatory injunction with the contract between him and his employer. The court dismissed the petition, and the case finally reached the supreme court of the United States. Ex parte Lennon, 166 U. S. 548, 17 Sup. Ct. 658. The objection was there raised to the proceedings that the order was mandatory and the issuance of such a preliminary order was invalid. In answer to this contention, the supreme court said:

"Perhaps, to a certain extent, the injunction may be termed mandatory, although its object was to continue the existing state of things, and to prevent an arbitrary breaking off of the current business connections between the roads. But it was clearly not beyond the power of a court of equity, which is not always limited to the restraint of a contemplated or threatened action, but may even require affirmative action, where the circumstances of the case demand it."

In support of this jurisdiction, the court cites Robinson v. Lord Byron, 1 Brown, Ch. 588; Hervey v. Smith, 1 Kay & J. 389; Beadel v. Perry, L. R. 3 Eq. 465; Whitecar v. Michenor, 37 N. J. Eq. 6; Broome v. Telephone Co., 42 N. J. Eq. 141, 7 Atl. 851. In Robinson v. Lord Byron, the leading English case upon the subject, Lord Chancellor Thurlow ordered an injunction to restrain the defendant "from maintaining or using his shuttles, floodgates, erections, and other devices, so as to prevent the water flowing to the mill in such regular quantities as it had ordinarily done before the 4th of April, 1785." The defendant, under this injunction, was compelled to remove such floodgates and other erections as he had constructed, if they impeded the regular flow of the water as it had existed before the date designated. This case was cited as authority in Cole Silver Min. Co. v. Virginia & Gold Hill Water Co., 1 Sawy. 685, Fed. Cas. No. 2,990, where Judge Field refused to dissolve a preliminary mandatory injunction, which had been previously issued by Judge Sawyer. Speaking of the authority of a court of equity to issue such an injunction, the learned judge said:

"Undoubtedly, the general purpose of a temporary injunction is to preserve the property in controversy from waste or destruction or disturbance until the rights and equities of the contesting parties can be fully considered and determined. Usually, this can be effected by restraining any interference with it; but in some cases the continuance of the injury, the commencement of which has induced the invocation of the authority of a court of equity, would lead to the waste and destruction of the property. It is just here where the special jurisdiction of the court is needed to restore the property to that condition in which it existed immediately preceding the commencement of the injury, so that it may be preserved until final decree."

The doctrine of the text-books is very clearly in accordance with these authorities. In High, Inj. § 356, the general rule that courts

of equity will not interfere, by preliminary injunction, to change the possession of real property, is stated with this qualification:

"Notwithstanding the general rule, as stated in the preceding section, by which courts of equity refuse to interfere with possession before the right is determined at law, if defendant's possession is but an interruption of the prior possession of complainant, whose right is clear and certain, an injunction may be allowed without compelling complainant to establish his title by an action at law. The interference, in such cases, rests, as in cases of nuisance, upon a clear and certain right to the enjoyment of the subject in question, and an injurious interruption of that right, which upon just and equitable grounds ought to be prevented."

In Beach, Inj., there is a reference, in section 1392, to the case of Sproat v. Durland (Okl.; 1894) 35 Pac. 682, as an illustration of the plastic character of the injunction process when required to be used in a new and unfamiliar environment. The court there held that:

"A mere assertion of right is insufficient to deprive the rightful occupant of the quiet use of land, and, as between settlers upon the public domain, the courts should inquire into the status of the lands far enough to determine whether or not a person asserting a claim of possession has a color of right to such possession under the homestead law, and if it be found that he is a mere trespasser, or that the law will not, under a fair construction, warrant his claim, it is the clear duty of the courts to issue a mandatory order in injunction, restraining him from the further unlawful occupancy."

In Bisp. Eq. § 400, the author refers to the fact that there is a tendency towards greater liberality in granting mandatory orders on preliminary applications, and says:

"Indeed, there would seem to be no good reason why, in a proper case, a mandatory injunction should not issue upon preliminary hearing. Gross violations of right may occur in the shortest possible time, and a few hours of wrongdoing may result in the creation of an intolerable nuisance or in the production of an injury which, if prolonged, might soon become irreparable. In such cases, the interposition of the strong arm of the chancellor ought to be most swift; and if the immediate relief afforded could not, in a proper case, be restorative as well as prohibitory, no adequate redress would in many instances be given."

In a note to 3 Pom. Eq. Jur. § 1359, the author says:

"Preliminary mandatory injunctions have evidently been granted more freely by the English courts than by the American. Indeed, it has been said, in some American decisions, that a mandatory interlocutory injunction would never be granted. This doctrine is not only opposed to the overwhelming weight of authority, but is contrary to the principle which regulates the administration of preventive relief, and is manifestly absurd."

Counsel for respondent have cited a number of cases which announce the general rule that a court of equity will not, by a preliminary order, change the status of parties, require that which has been done to be undone, or restore property to a possession claimed to have existed prior to the interferences and disturbances which are the subject of the bill of complaint. All these cases may, however, be easily distinguished from the one at bar, as failing, in some important particular, to present sufficient grounds for the interposition of a court of equity by a mandatory order on preliminary application. It follows that, so far as the restraining order in this case may be deemed mandatory in effect, it was within the power of the court to

issue; and upon the facts, so far as disclosed in these proceedings, it was justified by the circumstances of the case. The motion to modify the order will therefore be denied.