Peoples Gas Light and Coke Company, Appellee, v. James M. Slattery et al., Appellants.

Gen. No. 39,297.

Opinion filed December 8, 1936.

OTTO KERNER, Attorney General, and BARNET HODES, Corporation Counsel, for appellants; JAMES G. SKINNER, MONTGOMERY S. WINNING, HARRY R. BOOTH, ROBERT H. FARRELL, HOWARD C. KNOTTS and W. ROBERT MING, JR., Assistants Attorney General, JOSEPH F. GROSSMAN, First Assistant Corporation Counsel, and JAMES J. DANAHER and FRED V. MAGUIRE, Assistant Corporation Counsel, of counsel.

COOKE, SULLIVAN & RICKS and WILSON & MCILVAINE, all of Chicago, for appellee; GEORGE A. COOKE, FRANCIS L. DAILY, EDWARD H. FIEDLER, JOHN M. CONNERY, JAMES T. MULLANEY and JOSEPH R. GRAY, all of Chicago, of counsel.

MR. JUSTICE O'CONNOR delivered the opinion of the court.

By this appeal James M. Slattery, Andrew Olson, Charles E. Byrne, James D. Marnane and Harry A. Barr, the members of the Illinois Commerce Commission, and Otto Kerner, Attorney General of the State of Illinois, seek to reverse an order or decree of the

circuit court of Cook county temporarily enjoining and restraining them from enforcing or attempting to enforce the present rates and charges for gas sold by plaintiff to the general public in Chicago, and from attempting to enforce any penalties against plaintiff for failure to charge the present rates. The order further provided that the injunction was issued on condition that plaintiff should not charge or collect from its customers for gas sold and delivered, rates or charges higher than those set forth in Schedule 19 filed by plaintiff with the Illinois Commerce Commission, and that plaintiff, on or before the tenth day of each calendar month, deposit in the American National Bank and Trust Company an amount equal to the difference between the present rates, which are set forth in Schedule No. 17, and the rates and charges set forth in Schedule No. 19. And that if it were finally determined that plaintiff was not entitled to the higher rates, it should make a refund to its customers of the excess charge over the rates mentioned in Schedule No. 17.

September 1, 1936, plaintiff filed its complaint in equity. It was not verified, but seven days thereafter, on September 8, plaintiff filed a number of affidavits in support of its motion for a temporary injunction, in some of which the affiants swear that the allegations of the bill are true. The City of Chicago filed an intervening petition, and on September 10 the defendants filed their joint and several answer, which was not verified. September 21 defendants filed a number of affidavits in opposition to those filed by plaintiff, and on that day an order was entered referring plaintiff's motion for a temporary injunction to a master in chancery for a prompt hearing, the matter to be heard upon the complaint, the answer, plaintiff's affidavits, defendants' counter affidavits, plaintiff's rebuttal affidavits, and the intervening petition of the City, and

that the master report promptly his findings of fact and conclusions of law as to whether the court had jurisdiction of the cause, and whether plaintiff's motion should be allowed.

September 30 the master reported that he had conducted the hearing as ordered, found that the court had jurisdiction, and recommended that plaintiff's motion for a temporary injunction be denied. Plaintiff, defendants, and the City filed objections, plaintiff on the ground that the master did not recommend the allowance of its motion, and the defendants on the ground that the master erred in finding the court had jurisdiction. The objections were overruled, and they were afterward ordered to stand as exceptions. The exceptions of the defendants and the City were overruled, the exception of the plaintiff was allowed, and a decree entered as above stated.

The record discloses that plaintiff sells gas to the inhabitants of Chicago, and on June 17, 1933, filed its schedule of rates known as No. 17 with the Illinois Commerce Commission. A hearing was had before the Commission as to the reasonableness of the rates, and they were approved by the Commission on April 15, 1934; such rates had been in effect for some time before this date. July 16, 1935, the Gas Company filed with the Commission its schedule of rates known as No. 18, whereby it proposed an increase of its rates, with certain exceptions, of 3 per cent of the total of any bill rendered, on the ground that on July 1, 1935, the "Public Utilities Tax Act" imposed a 3 per cent tax on the gross sales made by the company. August 7, 1935, the Commission entered an order suspending the proposed increase in rates until December 13, 1935, and the matter was set for hearing on September 25, 1935. Thereafter the cause was twice continued on motion of counsel for the Company, and on February 14, 1936, the Company began the presentation of its

evidence before the Commission, continuing to May 29, 1936. Evidence was then introduced by the Commission, and after argument of counsel the Commission entered an order on June 12, 1936, in which it was found the company had failed to establish that the rates then in effect (Schedule No. 17) were not just and reasonable, and, further, that the company had failed to establish to the satisfaction of the Commission that the rates proposed in Schedule 18 were just and reasonable, and it was ordered that the rates of Schedule 18 be cancelled and annulled. Fourteen days thereafter, June 26, 1936, the company filed with the Commission its schedule of rates No. 19, which rates were higher than those in schedule 18. July 1, 1936, the Commission entered an order suspending the increased rates until November 24, 1936, and the matter was set for hearing on July 15, 1936. On that date it was agreed by counsel for both parties that the Commission might consider all the evidence that had theretofore been offered in connection with Schedule 18. The company then introduced further evidence and rested. July 24, 1936, while counsel for the Commission were cross-examining some of the company's witnesses, it filed a petition with the Commission praying that it be given immediate authority to put into effect the schedule of rates in No. 19, pending the final determination of the reasonableness of such rates. August 21, 1936, the Commission entered an order denying the prayer, in which it was stated that the physical properties of the company, used by it in rendering gas service throughout the City, were of considerable magnitude, that the Commission had not had sufficient time to investigate the facts and was then unable to pass intelligently upon the merits of the company's contentions, one of the reasons being that the company was then using some natural gas in addition to the gas manufactured by it; that "no claim is

made to the effect that unless the emergency increase sought is allowed the company's service will in any way be impaired.'' Eleven days thereafter the company filed its complaint in the instant case, claiming that the rates and charges as set forth in Schedule 17 were confiscatory of its property and therefore in conflict with sec. 1 of the 14th amendment of the United States Constitution and sec. 2, Article (2) of the Constitution of the State of Illinois, and that defendants be enjoined from enforcing or attempting to enforce such rates and charges and from enforcing penalties against plaintiff and its representatives.

1. Defendants contend that the circuit court had no jurisdiction of the subject matter in the instant case because plaintiff had an adequate remedy at law, as provided by secs. 67 and 68 of the Public Utilities Act; that when the Commission entered the order of August 21, 1936, denying plaintiff's application for an immediate increase in rates pending the completion of the Commission's investigation, plaintiff should have petitioned for a rehearing, and if it were denied, take an appeal to the circuit or superior court of Cook county, as provided in secs. 67 and 68 of the Public Utilities Act, citing *Hoyne v. Chicago and Oak Park R. R.*, 294 Ill. 413; *City of Chicago v. O'Connell*, 278 Ill. 591; *Utilities Comm. v. Springfield Gas Co.*, 291 Ill. 209.

In the *Hoyne* case an information in chancery was filed by the State's attorney of Cook county against four elevated railroad companies, praying that they be enjoined from charging more than five cents per passenger, and alleging that an order of the Public Utilities Commission, which prescribed a six-cent fare, was unconstitutional, as an impairment of the City ordinances. A demurrer was sustained to the information, which was dismissed, and the case was taken to the Supreme Court where the decree was affirmed.

The court said the purpose of the suit was to have the order entered by the Public Utilities Commission, increasing the rate of fare, set aside as unlawful because the Commission had no power to deal with that question. The court said the information disclosed that there was a hearing before the Commission on the question of the sufficiency of the rates, and the matter was there contested; that sec. 41 of the Public Utilities Act gave the Commission complete power and authority to grant such hearing and to determine the just, reasonable and sufficient rates to be charged, and that sec. 68 of the act gave any person or corporation affected by the order an appeal to the circuit court of Sangamon county for the purpose of having the reasonableness of the rates inquired into and determined, and that an appeal might also be taken from the circuit court to the Supreme Court. The court held that the order was not void, and therefore not subject to a collateral attack, and said (p. 423): ''anyone affected by the order . . . had a complete remedy at law by appealing from the order in the mode pointed out by statute.''

In the *O'Connell* case, 278 Ill. 591, an order of the Utilities Commission was attacked on the ground that it was in violation of constitutional rights of the City and others. An injunction was sought to restrain the Commission from enforcing the order. The court held that the method prescribed by the Public Utilities Act, for determining the reasonableness of the order, was exclusive and the question could not be determined in a proceeding to enjoin the enforcement of it. On the other hand, plaintiff's position is that it is not making a collateral attack on the Commission's order of August 21st, but a direct attack upon the rates set forth in Schedule 17, which rates the Utilities Act provides must be charged, and that such rates are confiscatory of plaintiff's property; that if plaintiff prose-

cuted an appeal to the circuit court of Cook county, the only order that could be entered in that court would be to affirm or to set aside the order and that this result would not afford plaintiff an adequate remedy for the confiscation which results daily from the enforcement of the rates in Schedule 17; that in this State courts have no power to fix rates for public utilities; that such power has been delegated by the Legislature to the Commerce Commission, and *Alton & So. R. Co. v. Ill. Comm. Commission,* 316 Ill. 625, and *Illinois Commerce Commission v. Chicago & E. I. Ry. Co.,* 332 Ill. 243, are cited.

In the *Alton* case the court said (p. 629): "Courts are not rate-fixing bodies and have no authority of law to fix or establish rates for public utilities. This power belongs to the legislative branch of the State and has by the legislature been delegated only to the Commerce Commission. The Circuit court in reviewing an order of the Commerce Commission has no authority to revise or modify it."

The *Chicago & E. I. Ry. Co.* case, 332 Ill. 243, was an appeal from a judgment of the circuit court of Cook county reversing an order of the Commerce Commission which required a reduction in freight rates. The judgment was reversed with directions to approve the order of the Commission. The court there said (p. 248): "The right to review the findings of the Commerce Commission in a proceeding such as this is limited to the questions whether the Commission acted within the scope of its authority, whether the finding is without any reasonable foundation in the evidence, or whether a constitutional right has been infringed by such finding. . . . Orders of the Commission are entitled to great weight and can be set aside only if arbitrary or unreasonable or in clear violation of a rule of law. . . . The law does not authorize the court to put itself in the place of the com-

mission, try the question anew and substitute its judgment for that of the commission. . . . Where it is found that the order of the commission is without substantial foundation in the evidence it is the duty of the court to set it aside. . . . Tested by the canons regulating judicial power in cases of the sort now before us, the judgment of the Circuit court was erroneous. The court, exercising a special statutory jurisdiction, had no ·authority to order that the former rate of $1.85 be restored after setting aside the order fixing the rate at $1.65. . . . The law was made to protect those served as well as those who serve.''

Obviously, no rule of law—no formula—can be stated that will apply to every case in determining whether one has an adequate remedy at law. It would be futile to attempt to formulate such a rule. Each case must be decided on the particular facts involved. While general pronouncements in opinions and statutes may be helpful in reaching a correct decision, they cannot be universally applied. So, in the instant case, although the Public Utilities Act points out a method to be followed where one is dissatisfied with the orders of the Commission, yet this method is not exclusive where to follow the provisions of the act would result in irreparable damage. In such cases, resort may be had to courts of equity. *Oklahoma Gas Co. v. Russell,* 261 U. S. 290; *Prendergast v. New York Tel. Co.,* 262 U. S. 43; *Pacific Tel. Co. v. Kuykendall,* 265 U. S. 196.

In the *Kuykendall* case the Telephone Company filed a bill to enjoin the State Commission from interference with increases in telephone rates. An interlocutory injunction was refused, the bill dismissed and an appeal taken to the Supreme Court. The contention of the Telephone Company was that the rates were confiscatory. The statute of the State of Washington authorized the company to apply to the superior court for a review of the order to determine the reasonable-

ness and lawfulness of the rates. Without having applied to the superior court for review the Telephone Company filed its bill alleging that the existing rates were confiscatory. The trial court held that the suit was prematurely brought because the company had failed to exhaust the remedies provided by the State statute, and a decree was entered dismissing the bill, which decree was reversed by the Supreme Court, where the Chief Justice, in speaking for the court, said (pp. 204–5): "Under such circumstances comity yields to constitutional right, and the fact that the procedure on appeal in the legislative fixing of rates has not been concluded will not prevent a federal court of equity from suspending the daily confiscation, if it finds the case to justify it."

In the case at bar plaintiff contends that the enforcement of the rates in Schedule 17 confiscates its property daily, and unless and until it is permitted to charge higher rates, the confiscation will continue and that such loss can never be recovered. Whether the facts before us are sufficient to establish confiscation as contended by plaintiff, must be determined before a proper decision can be made, and it therefore follows that the circuit court has jurisdiction of the matter.

2. Defendants further contend that the injunctional order "had the effect of changing rather than maintaining the *status quo* and was therefore mandatory and should not have been issued except after full and complete hearing and final determination of the merits," while plaintiff's contention is that the injunction against the defendants "was preventative and not mandatory in character." We do not stop to consider the several shades of distinction contended for by each side on this question, for the result brought about by the injunctional order is clear. By it the rates and charges in Schedule 17 are rendered ineffective and thereupon plaintiff is entitled to charge higher rates,

provided they do not exceed those mentioned in Schedule 19, the amount of such excess to be retained by plaintiff or returned to its customers, as might be determined when the rates were finally fixed by the Commission. While as a general rule a preliminary, mandatory injunction will not be awarded, yet in a proper case the issuance of such an injunction may be the only effective remedy (*Pokegama Sugar-Pine Lumber Co. v. Klamath River Lumber and Imp. Co.*, 86 Fed. 528) and as said in *United Rys. of San Francisco v. Superior Court*, 172 Cal. 80 (155 Pac. 463): "There is no magic in the phrase 'maintaining the *status quo*' which transforms an injunction essentially prohibitive into an injunction essentially mandatory." Whether the injunction in the instant case was properly awarded must be determined upon a consideration of the facts.

3. A further point is made by defendants that the court erred in entering the order "without making any findings of fact or conclusions of law," and in support of this the case of *Public Service Commission of Wis. v. Wis. Tel. Co.*, 289 U. S. 67, is cited. In that case a suit was brought in the Federal court to restrain the enforcement of an interlocutory order issued by the Commission of Wisconsin reducing telephone rates. The case was heard by three judges. The decree did not find any facts but merely stated that the order "would result in the confiscation of the property." On appeal to the Supreme Court in an opinion delivered by the Chief Justice it was said (p. 71): "The result of the court's inquiry into the issues and into the facts presented upon the interlocutory application, in order to satisfy itself as to the gravity of complainant's case and the probable consequences of unrestrained enforcement of the statute or order, should be set forth by the court in a statement of the facts and law constituting the grounds of its

decision. While that decision is not on the merits and does not require the findings of fact and conclusions of law which would be appropriate upon final hearing; the court should make the findings of fact and conclusions of law that are appropriate to the interlocutory proceeding.

"That duty the court below failed to perform . . . and we are not called upon, unaided by opinion or findings, to search this voluminous record to find a basis for the court's decree." The decree was vacated and the cause remanded with directions to the trial court to make findings of fact and conclusions of law.

In the instant case the master in his report simply states that the court had jurisdiction of the subject matter and recommended that plaintiff's motion for a temporary injunction be denied. In his decree the court found that it had jurisdiction of the subject matter and that plaintiff was entitled to a temporary injunction. Obviously the master's report was of little or no assistance to the chancellor and the decree throws no light on the subject matter. The decree is not in accordance with the rule announced by the U. S. Supreme Court in the case last cited. But the law in this State does not require that there be findings of fact and conclusions of law in the decree. Par. 192, sec. 64, ch. 110, Ill. State Bar Stats. 1935, Civil Practice; *Eick v. Eick,* 277 Ill. App. 329. Par. 3 of sec. 64 provides: "No special findings of fact or certificate of evidence shall be necessary in any case in equity to support the decree." And prior to the going into effect of sec. 64 a decree was not required to contain findings of fact and conclusions of law where the evidence upon which the decree was rendered was preserved in the record. *Central Trust Co. v. McGurn,* 257 Ill. App. 45. And since the evidence, viz., the complaint, answer and affidavits upon which the chancellor acted, are in the record before us, the require-

ments of the law are satisfied, though the master and chancellor might have thrown more light on the subject matter had there been proper findings of fact and conclusions of law.

4. We now come to the merits of the controversy. Defendants contend that plaintiff failed to establish that the rates and charges specified in Schedule 17 resulted in confiscation, and therefore the court should not have awarded the injunction.

In *Grand Trunk Ry. Co. v. Mich. Ry. Commission,* 231 U. S. 457, it was held that a public utility is entitled to demand a rate which would yield a fair return on the value of the property used by it for public convenience, and that the value of such property is to be determined as of the time when the inquiry is made. *Utilities Comm. v. Springfield Gas Co.,* 291 Ill. 209.

Counsel for plaintiff say in their brief that plaintiff's "theory is that the value of its physical property is fairly measured by the present cost of reproduction less depreciation," that the present value so measured is $156,037,952, which is made up of three items: (1) the present value of its physical property, $130,703,867; (2) working capital, $10,334,085; and (3) "going value inherent in its established business and organization," $15,000,000; that it is plaintiff's position that it is entitled to earn upon its value not less than 7 per cent or $10,920,000, and that its net earnings for the year 1935 were only 3 per cent or $4,735,817, and its estimated net earnings for the year 1936 were 3.1 per cent or $4,892,370. Counsel further say that if the annual charges for depreciation were computed upon the basis of the original cost of the property, as required by the "Classification of Accounts prescribed by the Commission," the net earnings for 1935 and 1936 would be but approximately 2.8 per cent upon the value of its property.

On the other hand, defendants' position is that the present value of plaintiff's property is not more than $120,000,000 and that the Commission's order of August 21, 1936, denying plaintiff an immediate increase in rates, "used as a tentative rate base the original cost depreciated plus working capital"; that plaintiff's valuation of the property at $156,000,000 was based on an estimate made by Sloan as to reproduction cost depreciated; that this method is erroneous in excluding "original cost new and depreciated as a factor in fair value"; that "the Company has violated the principle that original cost must be given due consideration in the determination of fair value of utility property for rate-making purposes"; that Sloan's appraisal included general overhead expenses of $19,966,416; and according to an affidavit this was substantially $7,000,000 excessive.

Defendants further point out other items that were included by plaintiff in this valuation of $156,000,000, which are shown by affidavits filed on behalf of defendants to be excessive; that Sloan's appraisal includes a considerable amount of property that is not used nor useful in rendering gas service; that excluding this property would justify an elimination of $4,500,000 from plaintiff's valuation; that the item $10,334,085, included in plaintiff's valuation as "working capital" should not exceed $7,500,000, as shown by the affidavit of Dittmer; that the item of $15,000,000 for "going value," included in plaintiff's valuation of its property, is not supported by any evidence except a statement of one of plaintiff's officers; that this item is nearly 10 per cent of plaintiff's claimed value, is speculative, and cannot be considered in determining whether plaintiff's property is being confiscated.

Plaintiff's position is that the valuation of $156,000,000 is justified by the evidence in the record; that Sloan was a consulting engineer of more than

thirty years experience and had been retained by many municipalities and commissions in the United States and Canada, as well as by private companies; that he had some knowledge of plaintiff's property, having assisted in making an inventory of it some twenty years ago; that in making the appraisal he worked more than eighteen months; that in valuing the company's land he adopted the appraisal made by three competent real estate men in Chicago; that such value, apart from structures, was $9,230,557; that he also adopted appraisal figures of plaintiff's buildings amounting to $1,106,950, being the estimated cost of reproduction, and that the value of such buildings depreciated was $929,405; that these figures were prepared by a well qualified architectural firm of Chicago and were incorporated in Sloan's finding.

Counsel for plaintiff further say that plaintiff's property was in part built by plaintiff and in part acquired through mergers and leases from 12 predecessor companies; that Stuart J. Barrett, assistant to plaintiff's vice president in charge of accounts, prepared an inventory of plaintiff's property showing original cost as of January 1, 1936, incurred by plaintiff and its predecessor companies, covering a period of more than 80 years, to be $115,752,858, of which sum $4,556,121 was the cost of land and $111,196,737, cost of physical structures and facilities other than land; that this property was the same property assessed by Sloan; that this is all of plaintiff's property that is used and useful in its business of supplying gas as a public utility. Counsel also point out other affidavits, all tending to show that the property had a value of $156,000,000. Much more is said on this subject, but we think it would serve no useful purpose to analyze it further.

*San Diego Land and Town Co. v. Nat. City,* 174 U. S. 739, was a proceeding to fix rates that should be

charged and collected for water furnished. The court there said (p. 758): "We are dealing here with an ordinance fixing rates or compensation to be collected within a given year for the use of water supplied to a city and its inhabitants." (p. 759): "The only issue properly to be determined by a final decree in this cause is whether the ordinance in question, fixing rates for water supplied for use within the city, is to be stricken down as confiscatory by its necessary operation, and therefore in violation of the Constitution of the United States." The court there also said (p. 754): "But it should also be remembered that the judiciary ought not to interfere with the collection of rates established under legislative sanction unless they are so plainly and palpably unreasonable as to make their enforcement equivalent to the taking of property for public use without such compensation as under all the circumstances is just both to the owner and to the public; that is, judicial interference should never occur unless the case presents, clearly and beyond all doubt, such a flagrant attack upon the rights of property under the guise of regulations as to compel the court to say that the rates prescribed will necessarily have the effect to deny just compensation for private property taken for the public use."

*Grand Trunk Ry. Co. v. Mich. R. R. Commission,* 231 U. S. 457, was an appeal from a decree by three judges denying a motion for an interlocutory injunction against an order of the Railroad Commission. The court said (p. 465): "And, as we have seen, the order of the Commission was suspensory only of the tariff of the appellants, not a final determination against it or of the conditions which might or might not justify it. It is too late in the day to question the competency of a State to create a commission and to give it the power of regulating railroads and necessarily of investigating the conditions upon which regulation may

be directed. If a judicial interference is sought with the exercise of such power, it must be clearly shown to have been transcended, not left as a conclusion from the balancing of conflicting affidavits, or even, it may be, as held by the District Court, on *ex parte* affidavits. Courts are reluctant to interfere with the laws of a State or with the tribunals constituted to enforce them. Doubts will not be resolved against the law, nor the decision of its tribunals prevented or anticipated unless the necessity for either be demonstrated.''

In *Wisconsin-Minnesota Light & P. Co. v. R. R. Commission,* 267 Fed. 711, while the commission was engaged in investigation of the utility company's application for increase of rates, it filed suit seeking the right to increase its rates and enjoin the enforcement of the rates then in force on the ground that they were confiscatory. The court there said (p. 722): ''The pleadings as they now stand, and the discussion by counsel upon argument, preclude the thought that any fact or facts could be seized upon by the court as sufficiently free from doubt and as sufficient basis in equity to justify the requisite preliminary conclusion. . . . The court could not with propriety award preliminary relief.''

In *Cumberland T. & T. Co. v. R. R. and Public Util. Commission,* 287 Fed. 406, a bill was filed against the commission to enjoin the enforcement of orders of the commission in reference to the maintenance of existing telephone rates and for an increase of rates. The injunction was asked before the completion of the hearing before the commission, but was denied. The verified bill there alleged that the rates were inadequate to yield a reasonable return. (p. 409): ''that since January 1, 1920, its business has been conducted at an actual loss; that said existing rates are confiscatory and in violation of the Fourteenth Amendment to the Constitution of the United States.'' The motion for

an interlocutory injunction was heard upon the pleadings, affidavits and counter affidavits, including some documentary evidence. The court there said that although the hearing before the commission had not been completed (pp. 416–17): "there is strong authority that the utility, upon a showing that such reduced rates are confiscatory, may be granted an injunction, restraining, upon proper refunding bond, the enforcement of such reduced rates pending the continuance of the rate-making process."

Since the instant case was heard on the pleadings and affidavits, we are in as good position to determine the truth of the matter in controversy as were the master and the chancellor. And bearing in mind that under the law the court should not interfere while the commission, to whom alone is delegated the power to fix rates and charges, is investigating the matter, "unless the case presents clearly and beyond a doubt" a flagrant case of confiscation and that such a conclusion should not be arrived at "from the balancing of conflicting affidavits," we think the injunction should not have been awarded.

On plaintiff's own showing, it is now making an annual net profit of more than 3 per cent on its own estimated value, and it further appears from plaintiff's figures that its profits are increasing. Courts take judicial notice of the great depression during recent years. *Straus v. Chicago T. & T. Co.*, 273 Ill. App. 63; *Atchison, T. & S. F. Ry. Co. v. U. S.*, 284 U. S. 248. It is also common knowledge that times are much improved over a few years ago and that the trend of business is upward. And since no contention is made that the Commissioners were unreasonably delaying the hearing, and also bearing in mind that public officials are presumed to perform their duties expedi-

tiously, we think the chancellor was in error in entering the decree for a temporary injunction.

The decree of the circuit court of Cook county is reversed.

*Decree reversed.*

MATCHETT, P. J., and McSURELY, J., concur.